[No. A040222. First Dist., Div. Two. Aug. 8, 1990.]

580 FOLSOM ASSOCIATES, Plaintiff, Cross-defendant and
Appellant, v.
PROMETHEUS DEVELOPMENT COMPANY et al., Defendants,
Cross-complainants and Appellants.
BROBECK, PHLEGER & HARRISON, Objector and Appellant.

**[Opinion certified for partial publication.*]**

---

*Pursuant to California Rules of Court, rule 976.1 and 976(b), this opinion is certified for publication with the exception of parts I, II and III of Prometheus's appeal.

6

## COUNSEL

Pettit & Martin, John B. Clark, James B. Harrington, Sharon L. O'Grady and David M. Rice for Plaintiff, Cross-defendant and Appellant.

Cartwright, Slobodin, Bokelman, Borowsky, Wartnick, Moore & Harris, Jack L. Slobodin, William L. Jacobson, Brobeck, Phleger & Harrison, John E. Sparks and S. Alan Childress for Defendants, Cross-complainants and Appellants and for Objector and Appellant.

## OPINION

**BENSON, J.**—This action involves three separate appeals taken from the judgment entered in a single action in the trial court after that court entered summary adjudication of issues in favor of 580 Folsom Associates (Folsom) and against Prometheus Development Company (Prometheus). Appellant Folsom seeks costs and attorneys' fees incurred in defending against a petition for writ of mandate filed in this court by Prometheus. Appellant Brobeck, Phleger & Harrison (Brobeck), trial counsel for Prometheus, seeks to overturn the trial court's order which awarded sanctions jointly and severally against the law firm and Prometheus under Code of Civil Procedure section 128.5. Appellant Prometheus seeks reversal of the order granting summary adjudication of issues and awarding sanctions against it. We shall affirm the judgment and the order granting sanctions. As amended, we shall affirm the order denying attorneys' fees.

### PROCEDURAL BACKGROUND

On July 1, 1986, Folsom commenced this action by filing a complaint against Prometheus and Sanford Diller, the chairman and sole shareholder of Prometheus, seeking to quiet title to real property and alleging breach of an indemnity agreement by Prometheus. The complaint also alleged various tort claims which are not relevant to this appeal. With its answer, Prometheus filed a cross-complaint against Folsom and Ronald Kaufman (Kaufman), a general partner of the Kaufman Family Partnership, which was in turn a general partner of Folsom.

On March 17, 1987, Folsom and Kaufman filed a motion for summary judgment or, in the alternative, for summary adjudication of issues addressing the first, fourth, fifth, sixth and seventh causes of action of the complaint and the entire cross-complaint. This motion was scheduled for hearing on April 15, 1987. The motion also sought sanctions against

Prometheus and/or Brobeck under Code of Civil Procedure section 128.5 on the grounds the allegations of the cross-complaint were fabrications and the cross-complaint was filed for the purpose of frustrating Folsom's efforts to obtain the relief to which it was entitled.

Hearing on the motion was continued to May 21, 1987. At this hearing, Prometheus objected to new evidence presented by Folsom in its reply brief. The hearing was continued to June 8, 1987 to allow Prometheus to respond to this new matter. At the continued hearing the court indicated it was inclined to grant Folsom's motion but was concerned that Folsom had not met its burden of proof concerning its entitlement to money due its sublessees for tenant improvements. Rather than forcing Folsom to start its motion all over again, the court again continued the hearing to allow the parties to present additional evidence. At this June hearing, Prometheus also stipulated it would provide Folsom a quitclaim deed to clear Folsom's title to the property, thus removing that issue from the action and mooting Folsom's fourth, fifth, sixth and seventh causes of action.

At the final hearing on the motion on July 29, 1987, the court granted Folsom's motion as to the first cause of action of the complaint for breach of contract and the entire cross-complaint. Turning to the matter of sanctions, the court very reluctantly "concluded that the actions taken here by Prometheus were not in good faith" and that sanctions were warranted both for the filing of a cross-complaint containing allegations that were "frivolous and . . . totally and completely without merit," and for submission of pleadings in opposition to Folsom's motion that the court found "contain[ed] lengthy citations to the record which, upon review, either do not relate to the factual proposition[s] for which they are cited, or . . . contain no competent evidence and refer to materials which are clearly incompetent." The court scheduled a further hearing to determine the amount of sanctions that would be assessed and the amount of attorneys' fees that would be awarded to Folsom based upon the contract clause authorizing an award of attorneys' fees to the prevailing party in any action brought to enforce the contract.

Prometheus then filed a petition for a writ of mandate in this court seeking to set aside the trial court's grant of summary adjudication. This court requested a response to the petition from Folsom and gave written advisement to Folsom that a peremptory writ might be issued in the first instance under Code of Civil Procedure section 1088, citing *Palma* v. *U.S. Industrial Fasteners, Inc.* (1984) 36 Cal.3d 171 [203 Cal.Rptr. 626, 681 P.2d 893]. Folsom filed its opposition brief; this court, by order dated September

17, 1987, denied the petition without issuing an alternative writ or an order to show cause. A petition to the Supreme Court was similarly denied.

Brobeck then filed in the trial court a motion for reconsideration of the order granting sanctions against it. Prometheus separately joined in this motion. This motion was heard at the previously scheduled hearing to determine the amount of attorneys' fees and sanctions. The court denied the motion for reconsideration, awarded Folsom $160,000 in attorneys' fees and $20,000 in sanctions. This ruling was later embodied in a written order. Folsom then voluntarily dismissed its remaining tort causes of action and final judgment was entered on October 19, 1987. Prometheus and Brobeck filed their appeals. Folsom moved the trial court for additional attorneys' fees incurred in the writ of mandate proceedings. The court denied this request, and Folsom then filed its appeal.

FACTUAL BACKGROUND

In September 1979, Kaufman and his wife acquired a renewable long-term lease with purchase options of certain improved real property situated at the corner of Folsom and Second Streets in San Francisco, known as 299 Second Street. In early 1980, the leasehold was transferred to a newly created partnership called "580 Folsom Associates," plaintiff in this action. An 80 percent share of Folsom was held by the Kaufman Family Partnership and the remaining 20 percent was held by another partnership called "W/P Folsom," the general partners of which are two local architects, Francis Whisler and Piero Patri. Kaufman was the managing partner of Folsom and was vested with general power to conduct the partnership business.

Prometheus is a California corporation engaged in the business of real estate development, management and investment. Sanford N. Diller (Diller) is the president, chief executive officer and sole shareholder of Prometheus.

Portions of this property were leased by Folsom to various subtenants, the principal one of which was the firm of Whisler Patri, a corporation through which Whisler and Patri conducted their architectural practice. All of the subleases provided for termination by Folsom upon the giving of certain specified notices. The subleases also provided that the subtenants would make certain improvements to the property to render it suitable for use as office space. The subleases further provided that, in the event of termination of the sublease prior to its expiration, Folsom would reimburse the subtenant, at the time it vacated the premises, for the unamortized cost of these improvements.

At one time Folsom had given consideration to undertaking development of a high-rise office building on the property but when presented with an acceptable offer to purchase its interest by Prometheus, Folsom decided to sell its interest. Prior to receipt of the offer from Prometheus, Folsom had entertained several offers for purchase of the leasehold by various other prospective developers during 1980 through 1983.

In early 1983, Kaufman decided to begin the application process with the city for a site permit for construction of a highrise building on the property. Whisler and Patri had informed Kaufman that "things [were] getting tighter and tighter in planning and zoning." In order to preserve the development potential of the property, Kaufman began seeking approval of the city planning department for eventual development of the site. Kaufman's purpose in submitting an application was to "get in line" at the planning department so that the development potential, and consequently the resale value of the property, would not be eliminated by future controls on downtown development.

Prometheus's offer to purchase the leasehold interest was unsolicited by Folsom; it was presented to Folsom by realtor John Cecconi of the firm of Coldwell Banker. The offer was in the amount of $4,040,000 and provided for an initial deposit of $250,000 and an extended escrow period of 18 months, at the conclusion of which the buyer would have the option either of closing the transaction by payment of the balance of the purchase price or of terminating the transaction and forfeiting its deposit.

Following receipt of this offer, negotiation of a formal purchase contract was carried out by Kaufman of Folsom, Cecconi of Coldwell Banker and Dale Frost of Prometheus. These negotiations ultimately resulted in the execution of a real estate purchase contract dated August 16, 1983. The final version of the contract was prepared entirely by Prometheus and consisted of a printed standard-form purchase contract and an addendum setting forth various provisions special to this particular transaction. The contract was signed by Frost for Prometheus and by Kaufman, Whisler and Patri for Folsom.

Other provisions of the purchase contract which are pertinent to this litigation are the following: (1) a provision permitting Prometheus to extend the escrow period and the closing date a further 12 months for a total of 30 months by payment to Folsom of an additional nonrefundable deposit of $250,000; (2) a provision for a so-called "free-look" or "contingency period" of 60 days following the execution of the contract, during which Prometheus would be entitled to terminate the contract without forfeiting its

deposit; (3) a provision requiring Prometheus to execute a quitclaim deed reconveying its interest in the property in the event it should fail to close escrow at the specified time; (4) a provision according Prometheus the "absolute and sole discretion" to modify any plans or proposals previously submitted to the city by Folsom and to determine the content of any plans and specifications to be submitted in the future; (5) a provision requiring that upon close of escrow Prometheus was to reimburse Folsom for the expenses previously incurred by it in processing the permit application; (6) a provision requiring Prometheus to exercise "due diligence" during the escrow period in pursuing city approval for a high-rise project on the site consistent with its own plans and specifications; (7) a provision tentatively retaining the architectural firm of Whisler Patri as the project architect subject to Prometheus' right to terminate its services at any time; (8) a provision permitting Prometheus to require termination of the subleases of the existing subtenants at any time during the escrow period, subject to an obligation on Prometheus' part to give Folsom "such written assurances and securities as [Folsom] may reasonably require to protect it against loss, damages, costs and expenses (including but not limited to attorney's fees) as consequences to giving such notices" of termination of the subleases; (9) a provision requiring Prometheus to "also pay to [Folsom] when such notice [of termination] is given the amount due tenants under the lease document[s]" for the unamortized cost of their improvements to the property; (10) a provision permitting assignment of the agreement by either party; and (11) a provision for payment of costs and attorneys' fees to "the prevailing party" in any litigation brought "to interpret or enforce this Agreement."

During the two months following its execution, the purchase contract was modified in certain minor respects by correspondence among the parties. The only modification relevant to this litigation was an agreement that the contingency period should be extended 30 days, to November 15, 1983, in order to permit Prometheus to satisfy itself concerning certain further contingencies. These contingencies were resolved, and Prometheus elected to proceed with the transaction following the expiration of the contingency period.

Kaufman requested and was given permission to accompany Prometheus's representatives to their initial meetings with the city planning personnel. Kaufman also kept informed of Prometheus's dealings with the city during the contingency period. Kaufman claimed his sole motive during this period was to ensure that Prometheus would do nothing to jeopardize the long-term development potential of the property during the time in which it still remained free to terminate the contract and receive back its deposit.

In September of 1984, Prometheus decided to exercise its right to require Folsom to terminate the subleases of the existing subtenants. Prometheus requested that it be relieved of its contractual obligation to render immediate payment to Folsom of the amounts that would become due to the subtenants upon such termination for the unamortized cost of their improvements to the property. In lieu of such immediate payment, Prometheus proposed that it furnish a written commitment on behalf of itself and its principal, Diller, to pay these amounts directly to the subtenants at such times as the subtenants actually vacated the property. Folsom agreed and the parties executed an indemnity agreement generally incorporating Prometheus' proposal and otherwise carrying forward all of the obligations that Prometheus had originally assumed under the purchase contract respecting termination of the subtenancies. This agreement, dated September 28, 1984, provided in pertinent part that Prometheus and Diller would pay to the subtenants "at the time they vacate, any amounts due to such subtenant or subtenants in accordance with their respective subleases," and that these parties would also "indemnify [Folsom] and hold [Folsom] harmless from loss, damages, costs, and expenses (including but not limited to attorney's fees) [that Folsom] may incur as a consequence of giving such notices."

Folsom gave the requested notices to terminate each of the subtenancies. Some months later, Prometheus requested that the subtenants be asked to stay on as month-to-month tenants of the property. All of the subtenants stayed except the principal subtenant, Whisler Patri, which informed Folsom and Prometheus that it had made a commitment for the lease of other premises following receipt of the notice to vacate.

Shortly before May 8, 1985, the scheduled closing date, Prometheus exercised its contractual right to postpone the closing an additional 12 months to May 8, 1986, by paying Folsom an additional deposit of $250,000.

In the fall of 1985, Rathie, Prometheus's project manager of the property, spoke with Kaufman about a further extension of the closing date for the purchase of Folsom's interest in the property. Rathie suggested a payment of $250,000 by Prometheus for the extension; Kaufman counteroffered to accept $500,000 for a one-year extension of the closing date; no agreement on a second extension of the closing date was reached by the parties. At an acrimonious meeting between Diller and Kaufman on January 15, 1986, Diller took the position that Prometheus was entitled to an indefinite closing date without the payment of any additional consideration whatsoever.

Whisler Patri actually vacated the property on January 31, 1986. On February 3, 1986, Folsom's attorneys sent a demand letter to Prometheus

and Diller seeking payment of $179,999.82 for W/P Folsom's unamortized tenant improvements and $21,315.04 for February rent due plus reimbursement for insurance and taxes paid by Folsom. Also on February 3, 1986, Diller wrote Kaufman in response to Kaufman's January 6, 1986, letter seeking $179,999.82 for tenant improvements. Diller sought verification that Whisler had vacated the premises, had left the premises in tenantable condition, had not removed any tenant improvements and that Whisler Patri had complied with all requirements of the sublease. Folsom's counsel replied to this letter by letter dated February 7, 1986, again demanding the money claimed due and requesting permission to send a messenger for the money that day. This letter enclosed certificates from Whisler Patri and Folsom with respect to Whisler Patri's subtenancy as requested by Prometheus. No invoices for tenant improvements were enclosed on the stated grounds that Prometheus had been furnished the invoices on two prior occasions. There followed a series of correspondence between counsel for each of the parties which added much heat to the controversy but shed no light on it.

By May 8, 1986, the closing date, Prometheus had not received permit approval to construct a highrise office building on the property; Prometheus declined to carry out the purchase of the property. Folsom demanded that Prometheus execute a quitclaim deed of its interest in the property. Prometheus continued to assert an interest in the property and accordingly refused to execute the requested quitclaim deed. This action followed.

DISCUSSION

*Prometheus's Appeal*

In the unpublished portion of this opinion we discuss Prometheus's contention the trial court erroneously granted summary adjudication on the first cause of action of the complaint for breach of contract on the grounds there were triable issues of fact with respect to the construction of the indemnity agreement. Prometheus also claims summary adjudication on its entire cross-complaint was improper on the ground there were triable issues of fact material to Prometheus's claims. Lastly, Prometheus asserts the trial court abused its discretion in awarding sanctions against it as there was no showing of subjective "bad faith" and its conduct was neither frivolous nor intended solely for the purpose of delay.

The analysis we follow in reviewing the granting of summary adjudication is the same as that used by the trial court. ■ "Since a summary judgment motion raises only questions of law regarding the construction

and effect of the supporting and opposing papers, we independently review them on appeal, applying the same three-step analysis required of the trial court. First, we identify the issues framed by the pleadings since it is these allegations to which the motion must respond by establishing a complete defense or otherwise showing there is no factual basis for relief on any theory reasonably contemplated by the opponent's pleading. [¶] Second[ly], we determine whether the moving party's showing has established facts which negate the opponent's claim and justify a judgment in movant's favor . . . . [¶] When a summary judgment motion prima facie justifies a judgment, the third and final step is to determine whether the opposition demonstrates the existence of a triable, material factual issue." (*AARTS Productions, Inc.* v. *Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064-1065 [225 Cal.Rptr. 203], citations omitted.)

## I-III*

. . . . . . . . . . . . . . . . . . . . . . .

## IV

*Whether There Were Triable Issues of Material Fact With Respect to the Issues Raised in Prometheus's Cross-complaint*

Prometheus's cross-complaint alleges causes of action for fraud, injunctive relief, breach of the joint venture agreement, breach of the covenant of good faith and fair dealing, breach of fiduciary duty, declaratory relief, unjust enrichment and quantum meruit. The relevant allegations of the cross-complaint are the following: (1) Kaufman instructed a real estate broker to seek a developer possessing experience in successful development of real property and possessing substantial cash to pursue development of the project at 299 Second Street; (2) Kaufman intended to make such a developer a joint venturer with Kaufman and Folsom of that property and intended to induce such a developer to contribute substantial cash and personal services to the project for a promised share of the proceeds to be realized from the development of the property; (3) Kaufman and Folsom formed with Prometheus a joint venture which was partly in writing and partly oral; (4) the terms of the joint venture were that: the parties assumed fiduciary obligations to each other; Kaufman and Folsom promised to contribute their claimed friendships, contacts and knowledge of how to obtain city approval of the project to the joint venture; Whisler and Patri promised

---

* See footnote, *ante,* page 1.

to provide assistance in obtaining a permit to develop the property; Prometheus promised to provide cash; each joint venturer promised not to interfere with the other's performance of obligations of the agreement and agreed the joint venture would continue until its successful completion or until accomplishment was in fact impossible; the parties agreed to share profits of the venture; and in furtherance of the joint venture agreement, the parties executed the real estate purchase contract with addendum and other agreements amending the contract, including an indemnity agreement; (5) when it became apparent no city approval would be forthcoming within the extended term of the purchase contract, Prometheus sought another extension but Kaufman and Folsom, without warning, demanded $500,000 for such an extension and if the sum were not paid, threatened to terminate the joint venture causing Prometheus to lose more than $1 million in out-of-pocket expenses; (6) when Prometheus did not pay this additional sum, Kaufman and Folsom threatened to deny in public that Prometheus possessed the right to appeal to the Board of Permit Appeals the denial of the permit application for development of the property; (7) Kaufman's and Folsom's undisclosed scheme was to induce an experienced developer to pay cash and perform services for the development from which Kaufman and Folsom would benefit without cost to themselves if the project were successful or, if unsuccessful, would retain the amounts paid and the services rendered by Prometheus for eventual development of the project; (8) in an effort to induce Prometheus to abandon the project, Kaufman and Folsom without warning asserted they were entitled to lost rental income under the indemnity agreement; and (9) this litigation was commenced to coerce Prometheus to forfeit its interest in the property.

On appeal, Prometheus contends "the relationship between the parties was broader and more complex" than the constricted view of the purchase agreement and indemnity agreement held by the trial court. Prometheus argues "sufficient evidence was put before the trial court to establish triable issues of material fact that the broader relationship between Prometheus and [Folsom] gave rise to fiduciary and other duties which [Folsom] breached to the injury of Prometheus." Prometheus further contends that under the appropriate standard of liberal construction of its evidence, there is a "germ of a potential cause of action . . . ." (*Jos. Schlitz Brewing Co.* v. *Downey Distributor* (1980) 109 Cal.App.3d 908, 917 [167 Cal.Rptr. 510].)

The parties agree on the elements necessary to show the existence of a joint venture. ■ " 'A joint venture . . . is an undertaking by two or more persons jointly to carry out a single business enterprise for profit.' The elements necessary for its creation are: (1) joint interest in a common business; (2) with an understanding to share profits and losses; and (3) a right to

joint control. ■ 'Such a venture or undertaking may be formed by parol agreement, or it may be assumed as a reasonable deduction from the acts and declarations of the parties.' " (*April Enterprises, Inc.* v. *KTTV* (1983) 147 Cal.App.3d 805, 819 [195 Cal.Rptr. 421], citations omitted.) "The existence of a joint venture depends upon the intention of the parties." (*Boyd* v. *Bevilacqua* (1966) 247 Cal.App.2d 272, 285 [55 Cal.Rptr. 610].)

In support of its motion for summary judgment on the cross-complaint, Folsom offered uncontroverted proof that no factual basis existed for any of the material allegations of the cross-complaint. It was established: (1) the initial contact between Prometheus and Folsom was arranged by Cecconi of Coldwell Banker, not Kaufman; (2) there was no plan or scheme by Kaufman or Folsom to inveigle Prometheus into a joint venture nor any false representations made by Folsom to Prometheus; (3) none of the persons who participated in the negotiations of the parties, Frost for Prometheus, Cecconi of Coldwell Banker or Kaufman for Folsom, had ever mentioned or heard mentioned a joint venture nor had entertained any notion that the transaction they were discussing might be characterized as a joint venture between Folsom and Prometheus; (4) neither Diller, who was an attorney as well as a developer, nor any of the other participants conceived of the notion of characterizing the transaction as a joint venture until this idea was suggested by Prometheus's counsel in the course of preparing the cross-complaint; (5) neither Kaufman, Whisler nor Patri agreed to assist Prometheus in the planning or permit process; (6) no assistance was rendered by Whisler Patri other than in its role as project architect before its termination by Prometheus nor by Kaufman other than during the "free look" or contingency period provided for in the purchase agreement; (7) no promises of any kind were made by Folsom, Kaufman or Whisler Patri other than those appearing in the written purchase contract; (8) no party to the transaction agreed to assume fiduciary obligations of any kind toward one another; (9) the only sharing of profits from the transaction agreed to by the parties consisted of Prometheus's acquisition of the property and Folsom's receipt of the deposits and the purchase price specified in the purchase agreement; (10) there was no agreement that the term of the purchase agreement would continue until successful completion of the project or that it would continue at all beyond the closing date as provided in the contract; (11) the only demands for additional payments by Folsom consisted of requests for costs due because of the termination of the subtenancies; and (12) no threats to sabotage the project were ever communicated to Prometheus or the city planning officials by Kaufman or Folsom other than the threat to commence litigation made to Prometheus after Prometheus denied liability for lost rent.

Indeed, some of the alleged "evidence" offered by Prometheus to support the allegation that the parties entered a joint venture does not even remotely support the point for which it was tendered. For example, Prometheus claims Kaufman referred to the relationship as a joint venture. The document relied on consists of Kaufman's notes of a telephone conversation which took place some two years before Prometheus was introduced to Kaufman. The notes refer to a foreign developer as a possible purchaser of the property. The reference to joint venture is a reference to Whisler Patri who had a partnership interest in 580 Folsom Associates. Prometheus also points to Kaufman's efforts to find a major tenant for the new building and his control of the marketing of the property. Again all the acts referred to occurred in December 1980 and February 1982, prior to Prometheus' involvement.

Diller testified in deposition that the factual allegations of the cross-complaint were true. He admitted, however, he did not participate in any negotiations between the parties concerning the terms of the purchase agreement. When asked during deposition to state a factual basis for his conclusionary statements that the allegations were accurate, he testified the factual allegations were "a conclusion of counsel" regarding "the legal consequences that flow from the facts of this case," or words to that effect.

Prometheus claims Kaufman continued to work informally to further the permit process even after Prometheus assumed the lead role. Among the evidence offered by Prometheus in support of this statement are pages 1998 through 2015 and pages 2022-2091 of the joint appendix. Nothing in these pages shows Kaufman did anything to further the planning process after the end of the contingency period on November 15, 1983. In fact, the record cited by Prometheus discloses that on December 1, 1983, Stephen Koch of Prometheus wrote that Prometheus was taking primary responsibility for the permit process and that on December 22, 1983, Kaufman wrote to Patri asking about the process to change the name on the application to Prometheus. Also on December 22, 1983, Kaufman wrote Patri complaining about receiving a late invoice from Whisler Patri for work on the permit application and stating that because Prometheus had already reimbursed Folsom for its work, Folsom had to absorb one half the bill.

No evidence shows Folsom exercised control over the project after expiration of the contingency period provided in the contract. Kaufman testified he ceased any involvement in the permit process at the end of the contingency period and had no further contact with city personnel on the subject property after that time. Kaufman stated he participated during the contingency period because he wanted to protect the development potential of the

property while Prometheus could still walk away from the contract without payment of any money.

Whisler Patri's work on the project also ended after the contingency period. Whisler Patri had been tentatively retained as the project architect under the purchase contract. On February 1, 1984, however, Prometheus informed Whisler Patri that Prometheus had retained a different firm to serve as project architect.

Prometheus claims that in a note dated September 1984, Karen Kaufman asked her father what was happening with "your" permits. The record contains no testimony concerning the document but the contents of the document suggest that it is notes of a telephone conversation between Koch of Prometheus and Karen Kaufman. Nor do we find evidence in the record to support Prometheus' claim that Folsom sought to oust Prometheus from the property before expiration of the escrow period. Prometheus admits that a draft letter by Kaufman in which he threatened to notify city planning officials that Prometheus no longer controlled the property was never sent to anyone. Stripped of the hyperbole, Prometheus's claim that Folsom acted in bad faith toward Prometheus is based on nothing more than Folsom's assertions that it intended to enforce its claimed rights to money for tenant improvements and lost rent which Prometheus refused to pay.

■ Prometheus admits in its opening brief on appeal that it "did not attempt to show an *explicit* written or oral joint venture agreement" in its opposition to the motion for summary adjudication on the cross-complaint. On appeal, Prometheus argues, as it did in the trial court, that the evidence of the acts and statements of the parties it presented in the trial court was sufficient to raise inferences of an *implied* joint venture relationship between the parties. Prometheus misconstrues its burden to defeat Folsom's motion for summary adjudication on the cross-complaint. The cross-complaint alleges the parties "formed a joint venture, in part written and in part oral, for the development of the project property." ■ A cross-defendant seeking summary adjudication need only offer evidence to disprove the allegations of the cross-complaint. Should the cross-complainant wish to offer a different factual assertion from that alleged in the cross-complaint, it must move to amend the cross-complaint prior to the hearing on the summary adjudication motion. (*AARTS Productions, Inc.* v. *Crocker National Bank, supra*, 179 Cal.App.3d 1061, 1064; *Dorado* v. *Knudsen Corp.* (1980) 103 Cal.App.3d 605, 611 [163 Cal.Rptr. 477].)

■ The evidence before the trial court establishes without conflict that there was no oral or written joint venture agreement between Prometheus

and Folsom. The three negotiators of the purchase agreement each testified that such an agreement was never discussed by the parties. There is no evidence Folsom was entitled to share in any profits that might be received by Prometheus from the project. As seller of the property, Folsom was entitled to receive the sale price and nothing more. We conclude summary adjudication was properly granted on the cross-complaint. (*Connor* v. *Great Western Sav. & Loan Assn.* (1968) 69 Cal.2d 850, 862-863 [73 Cal.Rptr. 369, 447 P.2d 609, 39 A.L.R.3d 224]; *Ragghianti* v. *Sherwin* (1961) 196 Cal.App.2d 345, 351-352 [16 Cal.Rptr. 583].)

*Prometheus's and Brobeck's Appeals*

V

*Whether Prometheus Should Have Been Sanctioned*

As a final ground for appeal Prometheus challenges the order granting sanctions against it.

Code of Civil Procedure section 128.5 (hereafter section 128.5) provides in pertinent part:

"(a) Every trial court may order a party, the party's attorney, or both to pay any reasonable expenses, including attorney's fees, incurred by another party as a result of bad-faith actions or tactics that are frivolous or solely intended to cause unnecessary delay . . . .

"(b) For purposes of this section:

"(1) 'Actions or tactics' include, but are not limited to, the making or opposing of motions or the filing and service of a complaint or cross-complaint . . . .

"(2) 'Frivolous' means (A) totally and completely without merit or (B) for the sole purpose of harassing an opposing party.

"(c) . . . An order imposing expenses shall be in writing and shall recite in detail the conduct or circumstances justifying the order."

■ Under the appropriate standard of review of an order awarding sanctions under section 128.5, it is not the province of this court "to consider the record on appeal to determine if appellant's conduct meets the standards of frivolousness . . . . [¶] . . . Where the issue on appeal is whether the trial court has abused its discretion, the showing necessary to reverse the trial court is insufficient if it presents facts which merely afford an

opportunity for a different opinion: '*An appellate tribunal is neither author-ized nor warranted in substituting its judgment for the judgment of the trial judge.* To be entitled to relief on appeal from the result of an alleged abuse of discretion it must clearly appear that the injury resulting from such a wrong is sufficiently grave to amount to a manifest miscarriage of justice; . . .' (*Brown* v. *Newby* [1940] 39 Cal.App.2d [615], 618 [103 P.2d 1018].)" (*Winick Corp.* v. *County Sanitation Dist. No. 2* (1986) 185 Cal.App.3d 1170, 1175-1176 [230 Cal.Rptr. 289], italics in original.) "In accordance with the usual rule on appeal, the judgment or order of the trial court is presumed correct. All intendments and presumptions are indulged to support it on matters to which the record is silent, and error must be affirmatively shown. [Citation.] Where evidence is in conflict, the appellate court will not disturb the findings of the trial court." (*Ellis* v. *Roshei Corp.* (1983) 143 Cal.App.3d 642, 645, fn. 2 [192 Cal.Rptr. 57].)

The trial court entered a detailed order setting forth its findings on the issue of sanctions against Prometheus and Brobeck.[1] This order found the

---

[1] In its written order, the trial court made the following findings: "1. The cross-complaint filed by Prometheus and Diller and the separate statement filed by Prometheus and Diller in opposition to the revised statement of undisputed facts are frivolous and in bad faith within the meaning of C.C.P. § 128.5 in the following respects.

"a. The cross-complaint filed by Prometheus and Diller in this action is so totally and com-pletely without merit as to support an inference that the cross-complaint was filed in bad faith.

"b. There is no evidence of any joint venture agreement, as alleged in the cross-complaint. The allegations of a joint venture in the cross-complaint are factually untrue and legally incorrect.

"c. The cross-complaint did not simply advance the legal position argued by Brobeck, Pro-metheus and Diller on their motion for reconsideration—that the Purchase Contract consti-tuted a joint venture agreement. Had it done so, the determination that no joint venture exist-ed could have been made upon demurrer or upon a motion for judgment on the pleadings. In-stead, the cross-complaint makes a series of factual allegations as to which cross-complain-ants have adduced no evidentiary support. These false factual allegations required Folsom and Kaufman to engage in wide-ranging and expensive discovery, causing the litigation to be-come far more onerous and expensive than it should have been.

"d. The determination that the cross-complaint was filed in bad faith is further supported by the fact that Prometheus and Diller were in a position to know the falsity of their allega-tions. This is not a case where evidence resting within solely the control or knowledge of Fol-som or Kaufman was needed to establish the truth or falsity of the allegations of the cross-complaint.

"e. Numerous portions of the cross-complaint contain false statements of fact as to which Prometheus and Diller could not have entertained a good faith belief that they were true, as follows:

"(i) Paragraph 8 of the cross-complaint states it was the purpose of Folsom and Kaufman to make an experienced developer a joint venturer who would contribute cash and personal services in exchange for a share of the proceeds of the development. There is absolutely no ev-idence that Ronald Kaufman or Folsom ever had such a plan.

"(ii) Paragraph 9 states that Folsom and Prometheus formed a joint venture, in part writ-ten and in part oral. In fact, Prometheus and Diller now concede that the only writing

cross-complaint filed by Prometheus to be frivolous and in bad faith because it was so totally without merit as to support an inference of bad faith.

■ Our laborious review of the record confirms ample support exists for the imposition of sanctions against Prometheus and Diller. In earlier discussion directed to whether triable issues were raised by the allegations of the cross-complaint (see pt. IV, *ante*) we highlighted numerous instances of the false allegations alluded to in the sanction order. It would serve no useful purpose to repeat the litany of material factual allegations found utterly devoid of supporting evidence. They are more than sufficient to justify the trial court's exercise of discretion. Indeed, Judge Pollak's determination

comprising the asserted joint venture is the Purchase Contract; there is no evidence of any partially oral joint venture as is described in the cross-complaint or of any oral agreement between the parties.

"(iii) Paragraph 10(a)-(b) states that Prometheus and Diller, on the one hand, and Kaufman and Folsom on the other, committed and agreed to assume fiduciary duties to each other; that Kaufman and Folsom 'promised to commit to the venture their claimed friendships and contacts;' that 'Whisler and Patri committed themselves individually, as architects able and willing to provide invaluable assistance in permit approval matters, to draw on their experience and knowledge to the purposes of the joint venture.' There is no competent evidence to support these allegations, and no evidence that there were any oral promises or commitments made beyond those contained in the written documents. The testimony of Diller attached to the reply memorandum in further support of the motion for reconsideration is cogent evidence that no oral promises of the kind alleged in the cross-complaint were ever made, and contradicts the position taken by Prometheus and Diller in the cross-complaint.

"(iv) Paragraph 10(d) states that '[c]ross-complainants and cross-defendants further promised each other and agreed that the joint venture would continue until it should appear that successful completion of the plan was either accomplished or in fact impossible . . . .' This statement is completely false. There is no evidence to support a good faith belief of the truth of this statement. The uncontroverted evidence shows that the parties intended the transaction to close on a specific date, May 8, 1986, and not at some undetermined date upon the agreement of all parties that development of the property was either accomplished or impossible.

"f. The declaration of Professor Hetland does nothing to establish that Prometheus, Diller and their counsel acted in good faith. Professor Hetland's declaration argues that the court should treat the Purchase Contract as constituting a joint venture, and that such an allegation could be made in good faith. That, however, is not what happened here. The allegation of joint venture made in the cross-complaint is made, not on the theory that the Purchase Contract should be treated as a joint venture, but on the theory that the acts and conduct of the parties prior to or in addition to their execution of the Purchase Contract caused the formation of the joint venture.

"g. A further and additional ground for sanctions pursuant to C.C.P. § 128.5 exists in the evidence cited in the separate statement filed in opposition to the revised statement of undisputed facts. This document includes citation to large quantities of material which does not support, directly or indirectly, the alleged facts for which they are cited.

"h. In light of the above, the Court in its discretion finds that an award of reasonable expenses incurred by Folsom and Kaufman as a result of the filing of the cross-complaint and of the separate statement pursuant to Civ. Proc. Code § 128.5 is warranted.

"i. These expenses are awarded jointly and severally, against Prometheus, Diller and Brobeck. In that way, the Court leaves to Prometheus, Diller and their counsel the determination as to how responsibility for the expenses should be allocated between client and counsel."

that the deposition testimony of Sanford Diller ". . . is cogent evidence that no oral promises of the kind alleged in the cross-complaint were ever made and contradicts the position taken by Prometheus and Diller in the cross-complaint" is sufficient, standing alone, to sustain the finding they could not have held a good faith belief in the truth of the cross-complaint allegations.

Prometheus and Diller seek to justify their position by reliance on the declaration of Professor Hetland wherein he states: "The testimony of Sanford Diller and the documents provide ample factual support for the allegations of the cross-complaint." This statement was made in the context of Professor Hetland's opinion that the allegations of the cross-complaint were consistent with those he would expect a competent attorney to make. Thus, while serving to excuse Brobeck's part in filing the unmeritorious cross-complaint due to the attorneys' reliance on information provided by the client, it is not helpful to the client who provided the false and misleading information in the first instance. In short, the trial court having correctly determined the Prometheus/Diller testimony and documents were insufficient to raise a question of fact concerning the factual allegations of the cross-complaint and, indeed, were in several material respects completely false, the declaration of Professor Hetland does not controvert these judicial findings in any respect and thus provides no evidence of good faith on which Prometheus and Diller may rely.

Under section 128.5, an action is deemed frivolous or in bad faith "if it is found to be totally and completely without merit." (*Winick Corp.* v. *County Sanitation Dist. No. 2, supra*, 185 Cal.App.3d 1170, 1177.) A complete lack of evidence to substantiate key allegations of the cross-complaint alleging the terms of a purported joint venture is sufficient ground for imposition of sanctions for the filing of a frivolous pleading. (*Finnie* v. *Town of Tiburon* (1988) 199 Cal.App.3d 1, 14 [244 Cal.Rptr. 581].) We conclude sanctions were properly awarded against Prometheus and Diller.

### Brobeck's appeal

The sole issue raised on appeal by Brobeck is that the order of the trial court awarding sanctions jointly against it and Prometheus was erroneously granted. We review this issue under the provisions of section 128.5 and under the standard of review set forth in the previous section discussing sanctions awarded against Prometheus.

To the extent Brobeck's arguments are based on statements made by the trial judge at the hearings on the motion for summary judgment and the

issue of sanctions, we reject the arguments. Section 128.5 calls for written findings of the trial court stating the reasons for imposing sanctions. Oral findings do not meet the requirements of section 128.5. (*Conservatorship of Durham* (1988) 205 Cal.App.3d 548, 552 [252 Cal.Rptr. 414].) Arguments based upon oral statements of the trial judge are inappropriate. We shall review the trial court's order based upon the written order.

The emphasis of Brobeck's argument is that it could not be sanctioned for filing the cross-complaint under the objective standard because it cannot be said that a reasonable attorney would find the cross-complaint to be totally and completely without merit and it cannot be sanctioned under the subjective standard without a finding of fault and Prometheus's fault cannot be imputed to it. (*In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 649-650 [183 Cal.Rptr. 508, 646 P.2d 179].) Brobeck points to the trial court's finding that Prometheus and Diller were in a position to know the falsity of their allegations and could not have entertained a good faith belief in those allegations and to the undisputed declaration of its partner, Robert S. Daggett, that he relied on Prometheus and Diller to provide the factual allegations contained in the cross-complaint. Brobeck also cites the declaration of Professor Hetland which opines that a reasonable attorney would find the cross-complaint filed by Brobeck appropriate.

We have no quarrel with Brobeck's position that it should not be sanctioned for filing the cross-complaint. After all, it was uncontested in the trial court that Brobeck initially relied on alleged factual information it received from Prometheus to draft the cross-complaint. However, Brobeck's arguments discount the fact that the trial court awarded sanctions on two grounds: in addition to finding that the allegations of the cross-complaint were not true, the trial court found that Prometheus's separate statement in opposition to Folsom's revised statement of undisputed facts was frivolous and filed in bad faith within the meaning of section 128.5. Subparagraph 1(g) of the order granting sanctions explains: "This document includes citation to large quantities of material which does not support, directly or indirectly, the alleged facts for which they are cited."[2]

Brobeck argues that the trial court's rejection of the evidence is based upon the trial court's "single minded approach" to the joint venture issue.

---

[2] Brobeck complains the sanction order violates section 128.5 in failing to "recite in detail" the conduct justifying the sanctions, citing *Garcia* v. *Sterling* (1985) 176 Cal.App.3d 17, 23 [221 Cal.Rptr. 349]. In *Garcia* the disapproved order stated merely the "motion to strike was '. . . totally devoid of merit, frivolous and not brought in good faith . . . .' " Unlike *Garcia*, here, the offending conduct is set forth with specificity.

Brobeck states it offered extensive evidence of the pre-Prometheus dealings of Folsom as evidence of Folsom's intention to find a joint venture partner.

In support of the opposition response to Folsom's statement of undisputed facts, Brobeck cited over 800 pages of evidence. Our review of this material supports the trial court's finding that large portions of the material do not support the facts for which they are cited.

We take as an example the discrete issue presented in Folsom's statement 95 which reads: "FOLSOM, KAUFMAN, PROMETHEUS and DILLER all understood that, unless PROMETHEUS and FOLSOM agreed to an extension of the May 8, 1986 closing date, PROMETHEUS' right to develop the 299 Second Street [property] would cease unless PROMETHEUS closed the Purchase Contract on or before May 8, 1986." In support of the statement, Folsom offered: the declaration of Kaufman in which he stated that neither he nor Folsom ever stated or implied that the closing date in the contract would be extended beyond May 8, 1986, without a payment of money for an extension and Prometheus did not pay for a further extension beyond May 8, 1986; Diller's admission that he understood the contract to provide that Prometheus had to purchase the property by a date certain; and Diller's admission that he discussed with Rathie, Prometheus's then project manager of the property, the contents of a letter written by Rathie to Kaufman in November of 1985 offering $250,000 for a 12-month extension of the contract closing date to May 8, 1987.

Prometheus's response to statement 95 refers the reader to a previous response to another statement of undisputed fact. It states: "Disputed. See the additional facts responsive to claim no. 53 and the record there cited."[3] The response to No. 53 reads: "The obligations of the parties as joint venturers were broader than explicit provisions of the purchase agreement on closing. Defendant-cross-complainants believe they were entitled, and in truth they had an enforceable right, to a time reasonable under the circumstances to bring the venture to success through obtaining of city development authorization. Kaufman and plaintiff likewise were obliged to use their best efforts in assisting the project to successful conclusion and obliged also to commit no acts contrary to the best interests of the venture."

Folsom's statement 95 concerns the parties' understanding of Prometheus's rights under the contract which would cease on the closing date, May 8, 1986. Most of the evidence offered by Prometheus to dispute this

---

[3] In other words the same 637 pages of material offered by Prometheus to dispute statement 53 is also offered to dispute statement 95.

statement dealt again with the issue of whether there was a joint venture.[4] What evidence Prometheus presented about the understanding of the parties as to the closing date supports, rather than disputes, Folsom's fact statement by showing Prometheus clearly understood its rights under the contract expired on May 8, 1986, unless it paid to extend the closing date.

The material cited by Brobeck in response to statement 95 includes documents and exhibits collected and submitted to the trial court under 39 separate tabs (tabs 30-68, inclusive) constituting, by actual count, a total of 637 pages. The overwhelming mass of this unnecessary and irrelevant documentation, as the trial court accurately observed, ". . . does not support directly or indirectly, the alleged facts for which they are cited." A few examples will serve to illustrate the point:[5] tab 31 includes a copy of the 40-page master lease by which Folsom held the leasehold estate on the property, the lease of which had been admitted by Prometheus in its answer; tab 33 includes Kaufman's deposition testimony concerning the master lease and the Kaufman Family Partnership Agreement, together with a copy of the 40 page Kaufman Family Partnership agreement, amendments to that agreement, and a copy of the 15-page 580 Folsom Associates Partnership agreement, again in a situation where there was no dispute about these documents; tab 49 includes 73 pages of Kaufman's deposition testimony and 102 pages of exhibits concerning other offers to purchase the property, including copies of option contracts dated November 1981 and April 1983 which were not signed by the potential buyers.

Nowhere in the 637 pages of material is a question of fact raised concerning whether Prometheus understood there was a date certain when Prometheus's rights under the contract would end; most importantly, except in a few instances, the material does not even remotely bear on the discrete issue raised by statement 95, and when it does, it favors Folsom's position.

Brobeck asserts the trial court did not make a finding that the opposition to the statement of undisputed facts was filed for the purpose of deceiving the court and this court cannot draw such an inference. Brobeck is incorrect. The trial court specifically found the pleading to be filed in bad faith and to be frivolous. Indeed, it was. Brobeck's prepared response in opposition to Folsom's revised statement of undisputed facts is, in many respects (as exemplified by its response to statement 95), no more than an

---

[4]The joint venture issue was specifically raised in Folsom's statement of undisputed facts numbers 67, 68 and 69.

[5]For those readers who may have interest in a more detailed summary of the content of the 39 tabs, we have included a topical description of these materials in an appendix to this opinion.

indiscriminate assemblage of a mass of documents having little or no bearing on the discrete issues raised. It is a deliberate, patent effort at obfuscation intended to overwhelm the trial judge charged with responsibility to determine fairly and impartially whether triable issues of fact exist. Sadly, it is a tactic too often employed in civil litigation, calling for an exorbitant expenditure of judicial time to sift through bales of irrelevant information in an attempt to glean a kernel of substance. It is a game the judicial system can no longer afford to play, if it ever could.

Section 128.5 covers bad faith actions or tactics. "Actions or tactics" is defined to include the opposing of motions; "frivolous" means totally without merit. While it was uncontested in the trial court that Brobeck *initially* relied on the factual information it received from Prometheus and Diller to draft the cross-complaint, Brobeck attorneys sat through all the discovery depositions noticed by Folsom and at some point it had to become clear to Brobeck, as it became clear to the trial judge and became clear to this court, that its clients had no evidence to support the factual allegations of the cross-complaint.

Brobeck's reliance on the declaration of Professor Hetland is inappropriate. The professor stated the theory of implied joint venture was one that a reasonable attorney would be expected to make. The cross-complaint, however, did not allege an implied joint venture; it specifically alleged the parties formed a joint venture which was partly in writing and partly oral. Professor Hetland did not address the fact that the theory Brobeck offered in opposition to the motion for summary judgment was outside the pleadings. Faced with the knowledge it did not have evidence to support the factual allegations of the cross-complaint, Brobeck chose the tactic of presenting a mass of material offered to prove a theory of the case which was outside the pleadings. Brobeck deliberately caused the trial court hours of work reviewing irrelevant matter which did not prove the statement for which the evidence was proffered. This conduct constitutes deliberate misleading of the court.

■■■ "A trial court is empowered to exercise its supervisory power in such a manner as to provide for the orderly conduct of the court's business and to guard against inept procedures and unnecessary indulgences which would tend to hinder, hamper, or delay the conduct and dispatch of its proceedings . . . . ■■■ An attorney has an obligation to respect the legitimate interests of fellow members of the bar, the judiciary, and the administration of justice." (*Mungo* v. *UTA French Airlines* (1985) 166 Cal.App.3d 327, 333 [212 Cal.Rptr. 369], internal quotation marks and citations omitted.)

"Under Business and Professions [Code] section 6068, 'It is the duty of an attorney: . . . [¶] (c) To counsel or maintain such actions, proceedings, or defenses only as appear to him or her legal or just, except the defense of person charged with a public offense. [¶] (d) To employ, for the purpose of maintaining the causes confided to him or her such means only as are *consistent with truth*, and never to seek to mislead the judge or any judicial officer by an artifice or *false statement of fact or law*.' " (*Young* v. *Rosenthal* (1989) 212 Cal.App.3d 96, 126 [260 Cal.Rptr. 369], italics in original.) Brobeck's conduct in this matter constituted an abuse of the judicial process when it represented to the trial court that the material referenced in its opposition statement was sufficient to raise a question of fact concerning the statements offered by Folsom. It did not do so and thus Brobeck misled the court. Brobeck attorneys then compounded their error by attempting to bury the lack of evidentiary support for their position in a mass of immaterial information.

This problem of the filing of frivolous pleadings for improper purposes has increased to the point that it has attracted the attention of academics and the courts. Our Supreme Court recently discussed the problem of frivolous litigation in an opinion considering a malicious prosecution action. The court noted in dictum that the imposition of sanctions in the initial action appears to be the most promising remedy for the problem. (*Sheldon Appel Co.* v. *Albert & Oliker* (1989) 47 Cal.3d 863, 873-874 [254 Cal.Rptr. 336, 765 P.2d 498].)

In *National Secretarial Service, Inc.* v. *Froehlich* (1989) 210 Cal.App.3d 510, 525, footnote 13 [258 Cal.Rptr. 506], the court found the defendants used the legal system "in an attempt to club a legitimate creditor into submission by forcing and extending this litigation when they in fact had no valid defenses." The court stated: "It is perhaps time that the courts, both trial and appellate, begin to speak and react more forcefully with respect to cases such as this one. Such an abuse of the legal system for no other purpose than to avoid paying a legitimate claim simply can no longer be tolerated. It is not fair to the opposing litigant who is victimized by such tactics and it is not fair to the greatly overworked judicial system itself or those citizens with legitimate disputes waiting patiently to use it. In those cases where such abuse is present, an award of substantial sanctions is proper." (*Id.* at p. 526, fn. omitted.)

■ Finally, Brobeck argues the trial court improperly awarded as sanctions compensation for time spent by Kaufman and Folsom personnel in defending against the cross-complaint. Brobeck contends the "expenses" to be awarded as sanctions under section 128.5 cannot include other than

costs including attorney's fees. If this were true it would mean that where, as here, a party is entitled to attorneys' fees under Civil Code section 1717 and costs under Code of Civil Procedure section 1032, then no sanctions could be awarded against the losing party no matter how frivolous its conduct or how unscrupulous its bad faith. We refuse to adopt such an interpretation of section 128.5. The term "expenses" has not been so limited by other courts. (*National Secretarial Service, Inc.* v. *Froehlich, supra*, 210 Cal.App.3d at pp. 526-527; *Finnie* v. *Town of Tiburon, supra*, 199 Cal.App.3d 1, 17.)

We conclude the trial court did not abuse its discretion in awarding sanctions in the modest amount of $20,000 against Prometheus, Diller and Brobeck.[6]

*Folsom's Appeal*

I

*Whether Folsom Is Entitled to Attorneys' Fees*
*Incurred in the Writ Proceedings*

Paragraph 18 of the purchase agreement signed by the parties provides: "In the event an action is commenced by either party to interpret or enforce this Agreement, the prevailing party shall be entitled to recover attorneys' fees and costs." Folsom appeals from the trial court's denial of its motion for attorneys' fees incurred in opposing Prometheus' petition for writ of mandate filed in this court and its subsequent petition filed in the Supreme Court. Folsom asserts it is legally entitled to recover the fees and costs incurred in the mandamus proceeding and that the judgment of the trial court should be modified accordingly. Folsom asks us to remedy the gap in the Rules of Court which it perceives as preventing it from recovering attorneys' fees and costs under the circumstances of this case.

After the trial court issued its order granting summary adjudication on Folsom's first cause of action and on the cross-complaint and awarding

---

[6]The trial court gave as its reason for the joint award: "In that way, the Court leaves to Prometheus, Diller and their counsel the determination as to how responsibility for the expenses should be allocated between client and counsel." We note that after the trial court's order was entered, the appellate court in *Young* v. *Rosenthal, supra,* 212 Cal.App.3d at pages 128-129, held that parties subject to a joint sanctions award are judgment debtors within the meaning of Code of Civil Procedure sections 882 and 883. The party paying such an award is entitled to pro rata contribution from the other party against whom sanctions were jointly awarded.

sanctions against Prometheus and Brobeck, Prometheus filed a petition for writ of mandate in this court seeking to set aside the rulings of the trial court. This court sought opposition to the petition from Folsom and advised Folsom we might issue a peremptory writ in the first instance. (*Palma* v. *U.S. Industrial Fasteners, Inc., supra*, 36 Cal.3d 171.) The preparation of this opposition entailed attorneys' fees of more than $29,000. This court denied the petition without stating any reason and without issuing an alternative writ or an order to show cause.

Prometheus then filed a petition for review in the Supreme Court seeking the same extraordinary relief. Folsom incurred attorneys' fees of over $13,000 for the preparation of the answer to this petition.

Folsom attempted to file a motion for attorneys' fees in this court while the petition was pending in the Supreme Court. This court had lost jurisdiction, however, since under rule 24(a) of the Rules of Court an order denying a petition for extraordinary relief without issuing an alternative writ or an order to show cause becomes final immediately after filing. Folsom then filed a motion for attorneys' fees in the Supreme Court seeking a total of $63,078.30 in fees.

While the attorneys' fee motion was still pending in the Supreme Court, Folsom filed, in the trial court, a motion for attorneys' fees incurred in the writ proceedings. The trial court denied the motion without prejudice. The Supreme Court ultimately denied the petition for review without stating a reason and, in the same order, stated: "The motion for attorney fees is denied." Thereafter, Folsom renewed its motion for attorneys' fees in the trial court and the motion was denied without comment.

Folsom argues that because this court denied the petition for writ of mandate without previously issuing an alternative writ or an order to show cause, it was impossible under the Rules of Court for Folsom to seek attorneys' fees in this court since the order was final immediately and we lost jurisdiction. Folsom asks us to fashion a remedy for this apparent inadvertent omission in the Rules.

Folsom claims it is clear that it was the prevailing party in the writ proceedings and under Civil Code section 1717 Folsom has a substantive legal right to attorneys' fees in the writ proceeding. We disagree that Folsom prevailed in the writ proceedings. We find no omission in the Rules of Court since we hold that Folsom was not the prevailing party in the writ proceedings and was not entitled to attorneys' fees upon the denial of the petitions in this court and in the Supreme Court. Folsom's motions for

attorneys' fees filed in the Supreme Court and in the trial court were premature. Only when a final judgment has been entered in this matter, whether after further appellate review or not, will there be a prevailing party.

"The denial of a petition for a writ is not a final adjudication of the facts alleged in the petition where neither the denial nor the record discloses a reason therefor." (*Donia* v. *Alcoholic Bev. etc. Appeals Bd.* (1985) 167 Cal.App.3d 588, 594 [213 Cal.Rptr. 447].) A denial of a writ challenge without opinion is not a determination of a cause. If this were not so, no party would file a petition for writ of mandate and risk a loss of the chance to a full hearing and a determination by written opinion on appeal if the writ were summarily denied. (*People* v. *Medina* (1972) 6 Cal.3d 484, 490 [99 Cal.Rptr. 630, 492 P.2d 686].) Since a denial of a writ petition without opinion is neither res judicata nor law of the case, it is clear that the party opposing the petition is not a prevailing party. The matter is clearly subject to later review should a party seek such review. For this reason the trial court correctly denied Folsom's motion for attorneys' fees in the writ proceedings. (*Palma* v. *U.S. Industrial Fasteners, Inc., supra,* 36 Cal.3d at pp. 182-183.) We conclude the order of the trial court denying attorneys' fees in the writ proceedings was correct on grounds the motion was prematurely filed. We shall modify the order, however, to provide that it is denied without prejudice to renewal of the motion if and when Folsom becomes the prevailing party in this litigation.

### DISPOSITION

The judgment and the order granting sanctions are affirmed. The order denying attorneys' fees incurred in the writ proceeding is affirmed as modified. The request for sanctions on appeal against Brobeck is denied. Folsom's request for attorneys' fees incurred in this appeal is granted, and the matter is remanded to the trial court for a determination of the amount of reasonable attorneys' fees that should be awarded Folsom to be paid by Prometheus and Diller. As required by Business and Professions Code section 6089, subdivision (b), a copy of this opinion shall be forwarded to the State Bar.

Smith, Acting P. J., and Peterson, J., concurred.

The petition of appellant 580 Folsom Associates for review by the Supreme Court was denied October 25, 1990.

APPENDIX

Tab 30—Diller testimony that there was no written joint venture agreement other than the purchase agreement, that as of May 8, 1986, he had not sought full legal advice so he had no opinion as to whether or not there was a joint venture between Prometheus and Folsom, and he first believed there was a joint venture after he consulted with counsel which was long after the purchase agreement was signed.

Tab 31—a copy of the 40-page master lease by which Folsom held the leasehold estate on the property.

Tab 32—Whisler's memorandum stating why he joined the partnership with Kaufman, dated November 1979.

Tab 33—Kaufman's deposition testimony concerning the master lease and the Kaufman Family Partnership agreement, together with copies of the 40-page Kaufman Family Partnership Agreement and amendments to that agreement and a copy of the 15 page partnership agreement of 580 Folsom Associates.

Tab 34—Kaufman's note dated January 18, 1982 stating Whisler/Patri would stay in a joint venture.

Tab 35—Kaufman's draft proposal to lease the property to an anchor tenant dated February 1982.

Tab 36—Kaufman's testimony about when he decided to apply for a site permit.

Tab 37—Kaufman notes of July 1980 and July 1981.

Tab 38—Whisler/Patri's preliminary planning code analysis dated December 1980 concerning 580 Folsom.

Tabs 39 and 40—Kaufman's letter to his attorneys dated September 1980 concerning the law firm becoming an anchor tenant of the property which described Kaufman as the developer.

Tabs 41, 42, 43 and 46—documents and testimony concerning the application for a site permit by Folsom dated between 1981 and September 1983.

Tabs 44—a single page of deposition testimony of Kaufman identifying exhibit 94 to the deposition.

Tab 45—a single page of deposition testimony, the relevance of which escapes us.

Tab 47—1980 letter from Kaufman to Del Monte Corporation about leasing space in the property.

Tab 48—a 1982 letter from a realtor registering a client for the property.

Tab 49—73 pages of deposition testimony of Kaufman and 102 pages of exhibits concerning other offers to purchase the property, including copies of option contracts dated November 1981 and April 1983 which were not signed by buyers.

Tab 50—a letter from Kaufman to one of the lessors of the property informing him that Kaufman had filed an environmental evaluation with the city planners and planned to file for a site permit.

Tab 51—letter of intent dated March 1983 from Coldwell Banker on behalf of the Northern Group to Kaufman about purchase of the leasehold interest for $4,040,000.

Tab 52—letter of intent from Coldwell Banker dated July 14, 1983, on behalf of Prometheus offering to purchase the leasehold interest.

Tab 53—a Whisler/Patri memo to the file.

Tab 54—a letter from Frost to Kaufman in which Frost suggests Dean Macris should attend the next staff meeting or that they could meet with Macris separately; a transmittal letter dated August 30, 1983, from Environmental Impact Planning Corporation to Kaufman; a Whisler/Patri memo to Kaufman dated September 2, 1983, about soil investigation of the property and additional communications between Kaufman and Prometheus about soil investigation; a proposed amendment to an

addendum to the purchase agreement stating Prometheus's remedies should Folsom default on the master lease and a signed version of the same document.

Tab 55—memo from Kaufman to Patri asking whether the transfer of the site permit application from Folsom's to Prometheus's name would "take them (us) 'out of line' at the Planning Department."

Tab 56—25 pages of Kaufman's deposition testimony and 70 pages of exhibits to the deposition including: an engineering certificate of the amount of square footage of the property; a memo from Whisler/Patri explaining the new Downtown Plan, a copy of the same memo showing a received date by Prometheus; a letter from Kaufman to the environmental consultant; a letter dated September 12, 1983, from Patri to Macris asking that the height restriction be raised for the property; correspondence about the floor area ratio for the building being cut from 7:1 to 6:1; correspondence and memos about planning for the project among Kaufman, Whisler/Patri and Prometheus; Frost's letter to Cecconi extending the due diligence period; another Whisler/ Patri review of the Downtown Plan, a Whisler/Patri memo saying all memos which go "out of the house" should be first sent to Kaufman for review; an invoice for work from Whisler/Patri to Kaufman dated October 13, 1983; Whisler/Patri's proposal for services to Koch dated November 22, 1983; a draft of a letter from Whisler/Patri to Koch which was sent to Kaufman for his prior review; letter from Kaufman to Patri dated December 22, 1983, complaining about late billing which caused Folsom to lose reimbursement from Prometheus for half the amount of the bill; a second copy of the memo from Kaufman to Patri asking if the transfer of the permit application from Folsom to Prometheus would cause the application to be taken "out of line"; several notes identified by Kaufman as having been written by his daughter, Karen.

Tab 57—Kaufman's deposition testimony that he understood any payment Prometheus made for an extension of the closing date beyond May 8, 1983, would be kept by Folsom and not applied to the purchase price; testimony about a November 5, 1985 letter from Prometheus proposing to pay $250,000 to extend the closing date and Folsom's counteroffer to extend the date for $500,000 dated November 12.

Tabs 58 and 59—Kaufman's deposition testimony about his December 2d meeting with Diller and Rathie to discuss the difference in the amounts to be paid for an extension of the closing date.

Tab 60—letter from Kaufman to his attorney reporting on the December 2, 1985, meeting with Prometheus.

Tab 61—Kaufman's letter to Diller enclosing a copy of the indemnity agreement and withdrawing his offer to extend the closing date for $500,000.

Tab 62—Kaufman sent copies of his letter to Diller about the January 15th meeting to Kaufman's attorney, Whisler and Patri.

Tab 63—January 23, 1986, letter from Diller to Kaufman.

Tab 64—letter of Diller responding to Kaufman's request for lost rent due to cancellation of Whisler/Patri sublease.

Tabs 65, 66 and 67—Kaufman's draft response to Diller's letter concerning Whisler/Patri's sublease; letter sent by Folsom's attorney to Prometheus demanding payment of the lost rent and other sums.

Tab 68—Folsom's attorney's letter dated August 7, 1986, to Prometheus's attorney which notified Prometheus that it did not have standing to appeal to the Board of Permit Appeals concerning the property because it failed to perform the purchase contract terms.