[No. D057627. Fourth Dist., Div. One. Jan. 11, 2012.]

RONALD HOWARD, Plaintiff and Appellant, v.
OMNI HOTELS MANAGEMENT CORPORATION, Defendant and
Appellant;
KOHLER CO., Defendant and Respondent.

## COUNSEL

Law Office of Ted Pelletier, Ted W. Pelletier; Bossio & Associates and Cheryl D. Bossio for Plaintiff and Appellant.

Lewis Brisbois Bisgaard & Smith, Douglas W. Lewis, Lisa W. Cooney, Julie R. Dann, Heidi S. Inman and Brittany H. Bartold for Defendant and Appellant.

Wilson Elser Moskowitz Edleman & Dicker, Donald P. Eichhorn and Joanne Madden for Defendant and Respondent.

## OPINION

**HUFFMAN, J.**—While he was a guest at the San Diego Omni Hotel, plaintiff and appellant Ronald Howard (Howard) slipped in a bathtub and was injured. Howard brought a personal injury action for damages against the manufacturer of the bathtub, defendant and respondent, Kohler Co. (Kohler), on theories of negligence and strict product liability. Howard also sued defendant and appellant Omni Hotels Management Corporation (Omni; sometimes referred to with Kohler as Defendants) on theories of premises liability and negligence. Howard's complaint alleges that the hotel bathtub was defective because its Kohler-supplied coating did not comply with "applicable standards," and Omni failed to protect him from an unreasonable level of danger there.[1]

Defendants each brought successful summary judgment motions, contending Howard could not prove essential elements of his cases against them. (Code Civ. Proc., § 437c; all statutory references are to this code unless noted.) The trial court, however, granted Howard's motion for new trial as to Omni, thus setting aside the Omni summary judgment. (§ 657.) Howard appeals the summary judgment in favor of Kohler, while Omni appeals the new trial order.

In Howard's appeal of the judgment for Kohler, he contends the trial court erroneously failed to recognize that he had presented sufficient expert opinion and evidence from which a trier of fact could have found Kohler liable on either negligence or strict product liability theories, utilizing a consumer expectations test. (*Barker v. Lull Engineering Co.* (1978) 20 Cal.3d 413, 430 [143 Cal.Rptr. 225, 573 P.2d 443] (*Barker*).) Specifically, Howard contends the trial court erroneously adopted Kohler's evidence of industry standards

---

[1] Although Howard's wife Lisa was also originally a plaintiff (claiming loss of consortium), she dismissed her claim.

regarding bathtub manufacturing, when it decided that no product defect or negligence had been demonstrated as a matter of law, nor were there any remaining triable issues of fact regarding causation of harm.

Alternatively, Howard argues it was incorrect for the trial court to rely on professional negligence authorities, when it assessed the strengths and weaknesses of Howard's expert testimony about negligent design or defects. (See, e.g., *Spann v. Irwin Memorial Blood Centers* (1995) 34 Cal.App.4th 644, 653–655 [40 Cal.Rptr.2d 360] (*Spann*).)

In its appeal of the new trial order, Omni contends the trial court erred as a matter of law when it concluded that triable issues of fact existed regarding actual or constructive notice to Omni, based on accidents in another of its hotels (or based on other information available to Kohler), of unreasonably dangerous conditions in Howard's rented room. Omni argues it lacked adequate notice that further protective measures might be required, in an exercise of its reasonable care, because the prior incidents were not shown to be substantially similar, and therefore they amounted to an inadequate showing, as a matter of law, to support any grant of a new trial on the complaint. (*Peterson v. Superior Court* (1995) 10 Cal.4th 1185, 1209 [43 Cal.Rptr.2d 836, 899 P.2d 905] (*Peterson*).)

On review of the summary judgment for Kohler, we agree with the trial court that the evidence produced by Howard, both expert and lay opinion, was insufficient to establish any triable issues of fact on his claims, and Kohler was entitled to judgment as a matter of law.

The trial court erred, however, in granting Howard's motion for new trial on his allegations against Omni, because the undisputed facts supported only one legal conclusion, that Howard would not be able to prevail on his premises liability or negligence theories, because he could not demonstrate Omni was placed on sufficient actual or constructive notice of any dangerous condition of the bathtub. The new trial order is reversed with directions to enter summary judgment for Omni, while the summary judgment for Kohler is affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Howard's Injury; Complaint

The basic circumstances of Howard's injuries are undisputed. In February 2006, while taking a shower in his hotel room at the San Diego Omni, Howard slipped and fell out of the bathtub, badly injuring himself. He could not remember the exact circumstances of the accident, but remembered that

he was standing in front of the running water and turning, when he slipped and "zip," "flew out of" the shower.

As he waited in the bathroom for the paramedics to arrive, Howard felt around inside the tub and found some antislip material in the bottom of the tub, but "not much." He "felt a slick surface" and found just a "little bit" of "material" on the "bottom of the tub." He noticed there was a grab bar down by the tub line, but no bathmat.

The bathtub in which Howard slipped and fell was a "Villager K-713" porcelain enamel bathtub manufactured by Kohler (the bathtub or tub) and sold to Omni for installation (in this, one of its 511 rooms there). After enameling a bathtub, Kohler routinely created a slip-resistant treatment (Safeguard) that involves essentially sandblasting grit at the floor of the bathtub's surface to create "peaks and valleys."

As against Kohler, Howard's complaint alleged it was negligent in its design and manufacturing processes, because "the coating of the bathtub did not comply with *applicable standards*, rendering the bottom surface of the bathtub slick and slippery." For strict product liability, Howard claimed the bathtub was defective because it was "so smooth, slippery, and slick as to have provided no friction or slip resistance because the coating of the bathtub did not comply with *applicable standards*." (Italics added.)

With respect to Omni, Howard pled negligence, in that Omni "knew or should have known of the unreasonable risk presented by the bathtub" in its hotel room, but failed to protect Howard, a user, from that risk or to keep the premises in a reasonably safe condition. Howard also alleged a claim against Omni for premises liability, by alleging that it was on notice of an unreasonably dangerous condition of its property, but failed to take reasonable care to protect Howard from "a slippery and slick bathtub."

Both defendants answered the complaint, alleging numerous affirmative defenses.

## B. Summary Judgment Motions

Following discovery, Defendants filed their motions for summary judgment. Both Kohler and Omni relied on expert engineering evidence presented by Kohler, supporting its claim that it had complied with industry standards in manufacturing the bathtub and its antislip coating.

## 1. *Kohler*

In Kohler's motion, it argued summary judgment was appropriate based on its evidence of its compliance with applicable industry manufacturing standards, with regard to providing a safe degree of friction on the surface of the tub. Howard had failed to meet his burden of proof to dispute the adequacy of such compliance, for either of his causes of action.

In his declaration and deposition testimony, Kohler's senior engineer Jeffery Collins described his inspection and testing of the bathtub and its antislip surface. Collins supplied evidence detailing the technical industry standards Kohler used during manufacture, as provided by two trade associations, the Associated Society of Mechanical Engineers (ASME), and the Associated Society for Testing and Materials (ASTM). He attached to his declaration a copy of the ASME standard that applied to the bathtub's manufactured coating (ASME A112.19.1M-1994, & supp. 1-1998).

Also, Collins attached to his declaration a copy of ASTM F 462-79, the other such industry standard (for testing purposes). Both these standards utilize a numerical coefficient of friction, which is a measure of the relative difficulty with which the surface of one material will slide over a surface adjoining it, or of another material. They also specify the surface area to be treated or tested.

Specifically, Collins's declaration explained that Kohler's antislip surface (Safeguard) is applied by essentially sandblasting the porcelain enamel surface of the bathtub in a pattern with aluminum oxide, or grit. This antislip treatment is formulated under the ASME standards for porcelain enamel bathing fixtures (ASME A112.19.1M-1994 & supp. 1-1998), which address the coefficient of friction and also the surface area of the antislip treatment, as follows. The bathing surface of the bathtub must yield a coefficient of friction of no less than 0.04, pursuant to ASTM F 462-79. The treatment must be applied according to a prescribed template, for coverage of "2 in. measured from all side and wall radii and 3 in. measured from the centerline of the drain and from the compound corner radii."

At the factory, Kohler staff audits five bathtubs per week to ensure that these standards are met, by bringing them from production to the laboratory where the testing equipment is kept. The staff also replaces the grit that is used for sandblasting on a routine basis, to assure that it does everything that it is supposed to do. Cleaning materials are not abrasive enough to damage the slip-resistant surface, because it is harder than glass. Kohler is routinely notified of any lawsuit, insurance claims, or consumer complaints about slippery tubs, and responds to them with investigations.

As prescribed by the ASTM standards, Collins tested nine zones in the Safeguard application on this bathtub, by using a "NIST Brungraber Tester" (a framed device with legs and little silicone feet). When measuring the tub, Collins found that the tested nine zones each showed an acceptable coefficient of friction level at 0.04 or more. The average coefficient of friction he found was 0.16, or four times more than required by ASTM F 462-79 and ASME (supp. 1-1998 to ASME A112.19.1M-1994).

Likewise, in Collins's measurement of the bathtub, he found that the Safeguard application started within two inches from the radius break of the bathtub (a point allowing for its curvature), as prescribed by the standards. When he measured the distance between the start of the Safeguard application and the centerline drain of the bathtub, also making an allowance for the compound corners radii of the bathtub, he determined that the application appropriately started three inches from those benchmarks. Collins thus determined that the Safeguard application was in compliance with the ASME requirements (supp. 1-1998 to ASME A112.19.1M-1994), in terms of its placement according to the template.

Kohler argued that Howard's discovery responses do not controvert the above evidence that these industry standards were met, but only claimed that discovery was ongoing.

### 2. Omni

In Omni's motion, it first argued that since it had purchased the bathtub from Kohler, and since Kohler had shown that the bathtub complied with industry standards for friction and slip resistance, this tub did not create an unreasonable risk of injury. Based on the knowledge it had, Omni argued it had not breached any duties that it owed to its guests, such as Howard. Kohler did not recommend the use of, and Omni did not routinely provide, bathmats to guests, but Omni would obtain them if they were requested (which they were not). Omni therefore argued it had not breached any duty owed to its guest, Howard, by its provision of a reasonably safe bathtub.

Omni provided a declaration from its independent engineer, T. Page Eskridge, stating that his test of the bathtub showed that it met industry standards for the friction coefficient. Omni's director of security, Lars Renteria, stated in his declaration that the San Diego hotel had been in operation for 22 months, this tub had been used and cleaned regularly, and there had not been any other reports there of bathtub injuries.

C. Opposition Showings

1. *Kohler*

In his opposition to Kohler's motion, Howard argued his expert evidence raised triable issues of fact as to whether this bathtub was dangerously slippery. Howard provided deposition excerpts from Dr. Kenneth A. Solomon, an engineer who is the chief scientist and founder of the Institute of Risk and Safety Analysis. Dr. Solomon described his inspection and testing of the bathtub and its antislip surface, and explained his views about the ASTM and ASME technical industry standards. He found that (a) Kohler's bathtub complied with the minimal industry standards for coefficient of friction and surface area coverage, but nevertheless, (b) the tub remained dangerously slippery, and should have been made safer (using simple, inexpensive means, such as a bathmat, more bars, or an aftermarket appliqué).

Specifically, Dr. Solomon's measurements showed that the "footprint" of the tub's Safeguard surface was "right on the margin," but met the template standard. Dr. Solomon testified the Safeguard application on the floor of this bathtub had a coefficient of friction of 0.22 to 0.60. Thus, the tub's coefficient of friction "met" the ASTM's 0.04 standard.[2]

Nevertheless, Dr. Solomon stated that this industry 0.04 friction standard is "very, very lenient," and is "so low that it is very slippery," or "right about the order of ice or Teflon." When bathtubs are in use, they develop a "much higher variability in coefficient of friction," when coated with water, soap or shampoo. Thus, the 0.04 standard "is just not a good practice." In his opinion, a coefficient of friction of 0.30 would be safer, and he would recommend to manufacturers a coefficient of friction level closer to 0.40.

Dr. Solomon opined that the industry standards are minimal and not stringent enough to satisfy basic "principles of forensic safety." ASTM F 462-79 was a standard, not a code. Dr. Solomon thus drew a distinction between the industry standards used, and his expert opinion, which interpreted principles of forensic safety.

Howard further argued that in the exercise of due care, Kohler should have made some recommendations to purchasers and/or users of the bathtub to

---

[2] Originally, the parties debated the issue of whether Howard, a relatively tall person, was standing on or at the very edge of the nonslip coating, as it had been applied to the bathtub. However, it is unclear whether Howard is still pursuing a theory that the nonslip coating was not wide enough, since he mainly argues that the tub as a whole remained too slippery, despite its compliance with industry standards.

implement additional safety measures for the protection of bathers. These included the use of bathmats, more bars, or an aftermarket antislip treatment.[3]

## 2. Omni

Howard next argued that even if Kohler were entitled to summary judgment, triable issues remain regarding notice to Omni of a dangerous condition on its premises, because (1) "ample evidence" supports a finding that the tub was dangerously slippery, and (2) Kohler's compliance with its industry standards in manufacturing the tub had nothing to do with the reasonableness of Omni's conduct in response to notice that its bathtubs were dangerous, as it had gained from reports of other hotel bathtub injuries that were in its corporate possession. At deposition, William Dingler, Omni's director of engineering, produced two Omni "Incident Reports" from March 2004 and August 2005, arising from slips in Kohler bathtubs by two different guests of the New Haven Omni. Each of those New Haven Omni guests, like Howard, required a hospital visit to treat the injuries. According to Howard, it was therefore reasonably foreseeable to Omni that additional protective measures should be taken (mainly providing a bathmat).

Further, Howard argued that Omni should be deemed to be upon constructive notice of at least four more hotel slip incidents in Kohler tubs, based upon knowledge that Kohler had gained about them. Howard believes that when Omni learned of the New Haven slipping incidents, it was placed upon a duty of inquiry to find out from Kohler if there were any further such incidents. Also, Howard contended that Omni lacked any adequate safety policies or communication among its hotels.

In reply, Omni disputed that it had any actual or constructive notice of any "dangerous condition" on its premises. Although Dingler, its director of engineering, had provided reports to Howard about the two incidents at the New Haven Omni, those reports were too general to amount to substantially similar accidents that would have placed Omni on notice of any dangerous condition. In their reply showings, both Kohler and Omni objected to Howard's reliance on those reports for that purpose.

---

[3] Howard also relied on other incident reports from non-Omni hotels showing there were slips in Kohler bathtubs. The court sustained Kohler's objections to those documents, but noted that Howard had adequately showed "that defendant[s] may have had notice of a few other incidents of falling in a bathtub." The court stated that those reports did not provide any context of how many such tubs were used in other hotels, which minimized the relevance of the evidence.

### D. Ruling: Kohler

In its order granting summary judgment to Kohler, the court framed the issues raised by the pleadings, as to whether the coating on the bathtub complied with "applicable standards." As relevant here, the court kept out an Omni-prepared incident report about Howard's fall, at Howard's objection that it was hearsay and prejudicial. The court also sustained in part the evidentiary objection by Kohler (made on relevance and foundation grounds) to Howard's reliance on passages in and exhibits to the Dingler deposition (the New Haven reports). The effect of this was that the trial court admitted and considered the evidence of the two New Haven incident reports "to show that defendant may have notice of a few other incidents of falling in a bathtub." Other evidentiary rulings are not directly challenged on appeal.

The court found that Kohler had carried its initial burden on summary judgment by presenting evidence that the bathtub complied with the industry standards (ASTM and ASME) for bathtubs. Howard had not shown a triable issue of fact by providing his expert's opinions, which did not amount to a different "standard." The court relied on the text of CACI No. 1221, defining the applicable negligence standard of care, as requiring a manufacturer to use the amount of care that a reasonably careful designer and/or manufacturer would use in similar circumstances, to avoid exposing users to a foreseeable risk. According to that standard of care language, Dr. Solomon's opinions that a greater standard would be better did not have sufficient factual support.

To further explain its reasoning about the deficiencies of the expert opinion offered by Howard, the court referred in its ruling to *Spann, supra,* 34 Cal.App.4th 644. The trial court explained that when Kohler showed that the bathtub met the ASME/ASTM industry standards, the burden was shifted to Howard to establish that a different standard applied to the bathtub's coating. Merely offering expert opinion that the bathtub "violated the principles of forensic safety," without a showing of a different applicable standard, did not create a triable issue of fact. The court granted Kohler's motion for summary judgment.

Later, Howard brought a motion for a new trial as to Kohler, asserting that his reference to "applicable standards" in his complaint did not mean "industry standards." Howard argued that since industry standards should not be read to establish an absolute standard of care in ordinary negligence actions, the trial court incorrectly granted summary judgment. Howard made a similar argument on the product liability claim, and contended that he had demonstrated there were triable issues of fact on whether the bathtub should meet more stringent legal safety standards. The trial court denied the motion,

noting that the only factual allegation by Howard was that the bathtub did not meet applicable standards, but he had failed to establish that different standards were controlling.

### E. Omni Ruling and New Trial Order

In originally granting summary judgment to Omni, the trial court interpreted Omni's objections to Howard's opposing evidence (which relied on the New Haven incident reports), as raising "foundation" grounds, which were unmeritorious. The court relied in its reasoning on those incident reports, which was not inappropriate regarding the notice argument. At the summary judgment proceedings, the court thus ruled that the two instances of actual notice to Omni of accidents in Kohler's tub (New Haven incidents) did not amount to adequate notice of unreasonable danger, because those were out-of-state Omni hotels, and not enough was known about the factual circumstances of those other accidents or the condition of those bathtubs, to determine if they were substantially similar in nature.

In granting summary judgment to Omni, the court originally followed the same product defect reasoning that it utilized regarding the Kohler motion, to the extent that it concluded Omni must have lacked any actual or constructive notice that the tub (meeting industry standards) was nevertheless dangerously slippery in some way. However, the court did not expressly rule on whether the tub was or was not an unreasonably dangerous condition of property.

In Howard's new trial motion, he argued that the order granting summary judgment for Omni was erroneous as a matter of law, on the same showing, because he had successfully raised triable issues of fact about the extent of actual or constructive notice, from the New Haven incidents, that Omni had of the dangers generally presented by the tubs.

Following oral argument, the trial court took the Omni motion under submission. In its order granting Howard a new trial, the court observed that the complaint did not specifically tie its liability allegations against Omni to any violation of "applicable standards." Rather, the court rejected "Omni's argument that the court's ruling as to [Kohler] on the 'applicable standard' issue precludes a finding of liability against Omni on the negligent and premises liability causes of action." Instead, the court found there were different allegations in the complaint as to each defendant, and there is "no reference to 'applicable standards' as to Omni." The court concluded that triable issues of fact existed about Omni's duty to take corrective action, in light of the extent of notice it had obtained.

Howard appeals Kohler's summary judgment, and Omni appeals the grant of a new trial to Howard.

## DISCUSSION

Howard contends the trial court erred in granting summary judgment to Kohler, because the expert and lay opinion he offered amply supported conclusions that its bathtub was defective under the consumer expectation standard, and/or Kohler breached its duty of reasonable care in producing and designing its products. Howard contends that when his pleading and proof are broadly read, according to the proper approach in summary judgment proceedings, he has presented triable material issues of fact and legal issues on whether "applicable standards" of safety should be interpreted differently and more stringently than industry standards.

For its part, Omni adopts the Kohler approach that it fully met the "applicable standards" for safety at its premises, by way of Kohler's compliance with industry standards. Omni further argues that under the usual standards for premises liability and negligence, it had no sufficient actual or constructive notice of any unreasonably dangerous conditions on its premises. We next set forth the relevant standards on appeal for defining and evaluating the scope of the issues raised by the pleadings, or the gist of the current causes of action, to determine whether triable issues of fact remain for resolution.

## I

### *APPLICABLE STANDARDS*

#### A. Basic Summary Judgment Rules

Established rules require review of summary judgment rulings under a de novo standard. (*Lunardi v. Great-West Life Assurance Co.* (1995) 37 Cal.App.4th 807, 819 [44 Cal.Rptr.2d 56]; *Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768 [107 Cal.Rptr.2d 617, 23 P.3d 1143].) The same issues of law are presented on appellate review of the grant of new trial on the claims against Omni. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 859 [107 Cal.Rptr.2d 841, 24 P.3d 493] (*Aguilar*).) We "apply the same rules and standards that govern a trial court's determination of a motion for summary judgment." (*Distefano v. Forester* (2001) 85 Cal.App.4th 1249, 1258 [102 Cal.Rptr.2d 813] (*Distefano*).) Summary judgment should be granted if "all the papers submitted show that there is no triable issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." (§ 437c, subd. (c).)

To satisfy its burden in seeking summary judgment, a moving defendant is not required to "conclusively negate an element of the plaintiff's cause of

action. . . . All that the defendant need do is to 'show[] that one or more *elements of the cause of action . . . cannot be established*' by the plaintiff." (*Aguilar, supra,* 25 Cal.4th 826, 853, fn. omitted.) Once this defendant's burden is met, the "burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists . . . ." (§ 437c, subd. (p)(2).) As the opposing party, the plaintiff must direct any opposition evidence toward the issues raised by the pleadings. (*Distefano, supra,* 85 Cal.App.4th 1249, 1264–1265.) It is not appropriate, at that time, to raise new legal theories or claims not yet pleaded, if there has been no request for leave to amend accordingly, prior to the summary judgment proceedings. (*Ibid.*)

On de novo review, we view the evidence in the light most favorable to the losing plaintiff, liberally construing the plaintiff's submissions and strictly scrutinizing the defendant's showing, to resolve any evidentiary doubts or ambiguities in the plaintiff's favor. (*Committee to Save the Beverly Highlands Homes Assn. v. Beverly Highlands Homes Assn.* (2001) 92 Cal.App.4th 1247, 1260 [112 Cal.Rptr.2d 732].) "Summary judgment will be upheld when, viewed in such a light, the evidentiary submissions conclusively negate a necessary element of plaintiff's cause of action, or show that under no hypothesis is there a material issue of fact requiring the process of a trial, thus defendant is entitled to judgment as a matter of law. [Citation.]" (*Thompson v. Sacramento City Unified School Dist.* (2003) 107 Cal.App.4th 1352, 1360–1361 [132 Cal.Rptr.2d 748].)

### B. Specific Summary Judgment Issues About Scope of Pleadings

We first address the parties' dispute about the scope of the pleadings and how they defined the issues properly presented for decision in these motion proceedings. As against Kohler, Howard could properly claim product liability, by using alternative theories of strict tort liability and negligence. (*Hernandez v. Badger Construction Equipment Co.* (1994) 28 Cal.App.4th 1791, 1829 [34 Cal.Rptr.2d 732] (*Hernandez*); *Jiminez v. Sears, Roebuck & Co.* (1971) 4 Cal.3d 379, 382–383 [93 Cal.Rptr. 769, 482 P.2d 681].) Howard broadly claims that his expert evidence about defective design was sufficient to oppose the motion, but that as a manufacturer, Kohler "*cannot defend a product liability action with evidence it met its industry's customs or standards on safety.*" (*Buell-Wilson v. Ford Motor Co.* (2006) 141 Cal.App.4th 525, 545 [46 Cal.Rptr.3d 147] (*Buell-Wilson*), judg. vacated on other grounds and cause remanded *sub. nom. Ford Motor Co. v. Buell-Wilson* (2007) 550 U.S. 931 [167 L.Ed.2d 1087, 127 S.Ct. 2250], italics added.)

■ However, admissibility of expert evidence about a manufacturer's compliance with regulations or trade custom varies with the types of theories

under which liability for a product defect is sought. (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 566 [34 Cal.Rptr.2d 607, 882 P.2d 298] (*Soule*).) In negligence and due care determinations, a manufacturer's "[c]ompliance with regulations, directives or trade custom does not necessarily eliminate negligence but instead simply constitutes evidence for jury consideration with other facts and circumstances." (*Hernandez, supra*, 28 Cal.App.4th 1791, 1830–1831, citing, e.g., *Stevens v. Parke, Davis & Co.* (1973) 9 Cal.3d 51, 65 [107 Cal.Rptr. 45, 507 P.2d 653].) For example, in a case in which " 'the manufacturer or supplier knows of, or has reason to know of, greater dangers [above and despite its compliance with regulations],' " then the manufacturer may not be insulated from negligence liability. (*Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 407 [185 Cal.Rptr. 654, 650 P.2d 1171] (*Hasson*).)

█ There are similar conceptual concerns in Howard's efforts to prove his two theories about Omni's potential liability under negligence and/or premises liability theories. As against Omni, Howard alleged that it, as a landowner, did not act reasonably under all the circumstances, when Omni came into possession of some actual or constructive notice that this type of bathtub had been involved in two or more slipping incidents that injured other hotel guests. In *Amos v. Alpha Property Management* (1999) 73 Cal.App.4th 895, 901 [87 Cal.Rptr.2d 34], the court refers to the concept that a defendant property owner's compliance with a law or safety regulation, in and of itself, does not establish that the owner has utilized due care. The owner's compliance with applicable safety regulations, while relevant to show due care, is not dispositive, if there are other circumstances requiring a higher degree of care. (*Ibid.*) A plaintiff seeking recovery for negligence against a landowner must establish sufficient facts or circumstances that support an inference of a breach of duty, to defeat a defense summary judgment motion. (*Buehler v. Alpha Beta Co.* (1990) 224 Cal.App.3d 729, 734 [274 Cal.Rptr. 14] (*Buehler*).) It is not enough to provide speculation or conjecture that a dangerous condition of property might have been present at the time of the accident. (*Ibid.*)

█ Because of the manner of pleading of Howard's somewhat conclusory allegations about the manufacturer's failure to meet "applicable standards," Kohler relies on cases such as *580 Folsom Associates v. Prometheus Development Co.* (1990) 223 Cal.App.3d 1, 18 [272 Cal.Rptr. 227], to define the scope of the issues to be properly addressed in its summary judgment motion. Generally, such proceedings are limited to the claims framed by the pleadings. (*Distefano, supra*, 85 Cal.App.4th at pp. 1264–1265.) A moving party seeking summary judgment or adjudication is not required to go beyond the allegations of the pleading, with respect to new theories that could have been pled, but for which no motion to amend or supplement the pleading was brought, prior to the hearing on the dispositive motion. (*Ibid.*; *580 Folsom Associates, supra*, at p. 18.)

On the other hand, cases such as *FPI Development, Inc. v. Nakashima* (1991) 231 Cal.App.3d 367, 385 [282 Cal.Rptr. 508] (*FPI*), have expressed the view that trial courts are empowered to read the pleadings broadly, "in the light of the facts adduced in the summary judgment proceeding," if those pleadings give fair notice to the opposing party of the theories on which relief is generally being sought. (*Ibid.*) The test is whether such a particular theory or defense is one that the opposing party could have reasonably anticipated would be pursued, and whether a request for leave to amend accordingly would likely have been granted (in that case, to add a potentially meritorious defense). (*Ibid.*)

■ Even the liberal analytical framework developed by *FPI, supra,* 231 Cal.App.3d 367, 381–385 acknowledges that the parties, during the motion proceedings, are assuming that only particular causes of action and certain issues are actually raised by the pleadings. To create a triable issue of material fact, the opposition evidence must be directed to those issues raised by the pleadings. (*Distefano, supra,* 85 Cal.App.4th at pp. 1264–1265.) Nevertheless, by analogy to the theory of trial, if the pleading (or answer) minimally advises the opposing party of the nature of the theory (or defense) pursued during the motion proceedings, the courts may, in appropriate cases, evaluate the evidence presented as supplementing the bare bones of the pleading (there, a defense). (*FPI, supra,* at p. 385; also see *American Airlines, Inc. v. County of San Mateo* (1996) 12 Cal.4th 1110, 1117–1118 [51 Cal.Rptr.2d 251, 912 P.2d 1198] [when a defendant's motion for summary judgment tests the sufficiency of the complaint, the courts assume the truth of the allegations of the complaint, and liberally construe them, seeking to attain substantial justice among the parties, as in a motion for judgment on the pleadings].)

The lesson we take from all these authorities is that we must consider the different causes of action differently, with respect to the factually specific allegations against each defendant. As against Kohler, we agree with Howard that ordinary negligence standards are within the scope of the "applicable standards" pled, and industry standards are only part of the inquiry. However, Kohler is not claiming its compliance with industry standards was a complete defense, but rather that all its evidence establishes that Kohler acted with due care in designing and fabricating its product, and that the evidence brought forward by Howard fails to controvert that showing. But Howard cannot, either at the time of the motion or on appeal, seek to expand the issues by redefining "applicable standards" to enlarge the particular duties owed to Howard by Kohler, through his own expert's testimony. Specifically, Howard is now claiming his expert can prove that Kohler failed to meet all applicable standards of care, when it failed to utilize his recommended different coefficient of friction standard, or failed to issue warnings of additional dangers in its product, or failed to advise its users that they must add

safeguards, such as the use of a bathmat or more bars. However, the complaint is not that specific, and the next issue is whether the expert, without more, can so define Kohler's duties.

As to the scope of the pleadings against Omni, it is a reasonable reading of the complaint (as the trial court did) that Howard's "applicable standards" allegations were specific to Kohler and did not control the pertinent allegations against Omni, as to industry standards. We agree with Howard that any ruling on the products liability/negligence claims against Kohler will not necessarily be dispositive as to the claims against Omni. Under negligence rules, it is theoretically possible that even a nondefective product, if poorly maintained or altered in an unsafe manner, could give rise to a premises liability finding against the owner of the location of the product, if an injury foreseeably occurred due to a lack of due care that should have been exercised, under all the known circumstances. Thus, even if it is determined that Howard has a failure of proof of any design defect or strict product liability against Kohler (pt. II, *post*), Howard's slightly different claims against Omni must be separately analyzed under premises liability authority (pt. III, *post*), and we next address those questions.

II

### *CLAIMS AGAINST KOHLER*

Both as to negligence and strict products liability, Howard's complaint alleged that Kohler's design and manufacturing processes were defective, because "the coating of the bathtub did not comply with applicable standards," rendering the bottom surface of the bathtub dangerous or defective, for lack of sufficient friction or slip resistance. We next outline the arguments and criteria for the products liability claims, then turn to the negligence arguments.

#### A. Manner of Proof of Product Liability: Role of Expert Evidence

■ For a theory of strict tort liability, "manufacturers are not insurers of their products; they are liable in tort only when 'defects' in their products cause injury. [Citations.]" (*Soule, supra*, 8 Cal.4th 548, 568, fn. 5.) There are two alternative ways to prove a design defect, each appropriate to its own circumstances: (1) the consumer expectations test, or (2) a theory of design defect, citing to technical and mechanical details in obscure components of a mechanism or complex circumstances of an accident. (*Stephen v. Ford Motor Co.* (2005) 134 Cal.App.4th 1363, 1370, fn. 6 [37 Cal.Rptr.3d 9] (*Stephen*), citing *Soule, supra*, 8 Cal.4th 548, 567–570, and *Barker, supra*, 20 Cal.3d 413, 430.)

On appeal, Howard's briefing cites the consumer expectations test as the appropriate standard for establishing the bathtub was defective. However, Howard's evidence also seemed to rely on the design defect test, by providing expert evidence from Dr. Solomon about the risks and benefits in the tub design and about the desirability of providing additional safety devices, such as bathmats, and failure to warn. This raises a problem on this record, because different definitions of defective product were brought before the trial court in the pleading and proof, and different rules have been developed for the proper role of expert evidence in addressing these product liability claims. (*Soule, supra*, 8 Cal.4th 548, 567–570.) We examine the record on each theory.

### 1. *Consumer Expectations Test*

In his opening brief, Howard alleges that even though the tub's antislip surface complied with industry standards, the tub as a whole was dangerously slippery, and "if Howard slipped on the Safeguard surface, it was not safe." That argument disregards the principle that "manufacturers are not insurers of their products; they are liable in tort only when 'defects' in their products cause injury. [Citations.]" (*Soule, supra*, 8 Cal.4th 548, 568, fn. 5.)

■ To the extent Howard is contending that the bathtub "*failed to perform as the ordinary consumer would expect*," he is limited in the amount of expert testimony he can present on such a theory. The consumer expectations test "is reserved for cases in which the everyday experience of the product's users permits a conclusion that the product's design violated minimum safety assumptions, and is thus defective regardless of expert opinion about the merits of the design. It follows that where the minimum safety of a product is within the common knowledge of lay jurors, expert witnesses may not be used to demonstrate what an ordinary consumer would or should expect. *Use of expert testimony for that purpose would invade the jury's function* [citation], and would invite circumvention of the rule that the risks and benefits of a challenged design must be carefully balanced whenever the issue of design defect goes beyond the common experience of the product's users." (*Soule, supra*, 8 Cal.4th at p. 567, italics added & omitted; see *Campbell v. General Motors Corp.* (1982) 32 Cal.3d 112, 126–127 [184 Cal.Rptr. 891, 649 P.2d 224] [when applying the consumer expectations test, the safety expectations of the general public are at issue, not safety regulations of an industry or government agency].)

■ We should read the authority quoted below, in *Buell-Wilson, supra*, 141 Cal.App.4th 525, 545, as distinguishable on its facts, and as limited to a discussion of the consumer expectations standard. There, we said: "A manufacturer cannot defend a product liability action with evidence it met its

industry's customs or standards on safety. [Citations, including *Grimshaw v. Ford Motor Co.* (1981) 119 Cal.App.3d 757 [174 Cal.Rptr. 348].] In fact, admission of such evidence is reversible error. [Citation.] This is because in strict liability actions, 'the issue is not whether defendant exercised reasonable care.' [Citation.] Rather, *the issue is whether the product fails to perform as the ordinary consumer would expect.*" (*Buell-Wilson, supra*, at p. 545, italics added; see *Soule, supra*, 8 Cal.4th at p. 566, fn. 2, noting that the authority of *Grimshaw* is somewhat limited because it mainly utilized the consumer expectations test for products liability.)[4]

Here, however, Howard has brought not only the *"issue of whether the product failed to perform as the ordinary consumer would expect"* before the court, but also design defect and due care issues, since his expert discussed them and all theories were pursued against Kohler. (*Buell-Wilson, supra*, 141 Cal.App.4th 525, 545.) Thus, Kohler's reliance on industry standards is a factor to be legitimately considered in the summary judgment proceedings. Properly read, the rule that a manufacturer is not entitled to a complete defense that it complied with industry standards applies to negligence cases and also, to some extent, applies to product liability cases. (Cf. 50A Cal.Jur.3d (2005) Products Liability, § 90, p. 676, on federal preemption issues ["The California courts of appeal have split on the issue of whether a manufacturer's compliance with federal motor vehicle safety standards, as set by the National Traffic and Motor Vehicle Safety Act, is a defense in a products liability action."].)

## 2. *Defective Design*

■ In the second established test for strict liability for a defective product, the issue is whether the claimed product defect "design embodies 'excessive preventable danger' [citation]." (*Soule, supra*, 8 Cal.4th at p. 567.) In such a case, the jury considers if " 'the benefits of the . . . design outweigh the risk of danger inherent in such design' [citation]. But this determination involves technical issues of feasibility, cost, practicality, risk, and benefit [citation] which are 'impossible' to avoid [citation]. In such cases, the jury

---

[4] *Soule, supra*, 8 Cal.4th at page 566, footnote 2, appears to limit the authority of *Grimshaw* as follows: "Under the particular circumstances, use of the consumer expectations test alone was approved in *Grimshaw v. Ford Motor Co.* (1981) 119 Cal.App.3d 757 [174 Cal.Rptr. 348]. There, a 1972 Pinto was instantly engulfed in flames when another vehicle struck it from the rear at 28 to 37 miles per hour. There was evidence that Ford knew placement of the Pinto's fuel tank was unsafe. The theory of trial was consumer expectations. Two weeks before the case went to the jury, we decided *Barker*[, *supra*, 20 Cal.3d 413]. Ford immediately requested a risk-benefit instruction, which the trial court refused. In a pre-*Campbell* appeal, the Court of Appeal affirmed. Noting both the timing and theory-of-trial problems, the court also observed that a risk-benefit instruction would actually have prejudiced Ford, because under *Barker*, it offered an additional means of recovery for design defect." (Italics omitted.)

must consider the manufacturer's evidence of competing design consider-
ations [citation], and the issue of design defect cannot fairly be resolved by
*standardless reference to the 'expectations' of an 'ordinary consumer.' "*
(*Ibid.*, italics added & omitted; see *Barker, supra,* 20 Cal.3d at p. 430.) In
such a case, expert testimony is required to assist the finder of fact. (*Soule,
supra,* at pp. 566–567.)

■ Deviation from an industry norm is not necessarily the test for a
defective product. (*Heap v. General Motors Corp.* (1977) 66 Cal.App.3d 824,
829 [136 Cal.Rptr. 304]; *Jiminez v. Sears, Roebuck & Co., supra,* 4 Cal.3d at
p. 383.) When the plaintiff alleges strict product liability/design defect, any
evidence of compliance with industry standards, while not a complete
defense, is not "irrelevant," but instead properly should be taken into account
through expert testimony as part of the design defect balancing process. The
rule discussed in *Buell-Wilson, supra,* 141 Cal.App.4th 525, 545 is not to the
contrary (that "[a] *manufacturer cannot defend a product liability action with
evidence it met its industry's customs or standards on safety*" [italics added]).
In strict liability actions, " 'the issue is not whether defendant exercised
reasonable care' " (*ibid.*), but in negligence it is. Also, expert evidence about
compliance with industry standards can be considered on the issue of
defective design, in light of all other relevant circumstances, even if such
compliance is not a complete defense. An action on a design defect theory
can be prosecuted and defended through expert testimony that is addressed to
the elements of such a claim, including risk-benefit considerations.

In this case, both parties offered expert testimony about the effect of
Kohler's compliance with industry standards, and even if such expert testi-
mony was not appropriate or dispositive on a consumer expectation test, it
was relevant to identify triable issues on the negligence and design defect
theories. We next ask whether that evidence sufficiently raised triable issues
of fact on issues framed by the complaint.

## B. Application of Rules: Strict Product Liability

■ Under *Soule*, expert opinion is admissible for purposes of assessing
risks and benefits of the product's design, to avoid resolving unsuitable cases
on a "*standardless reference to the 'expectations' of an 'ordinary con-
sumer.'* " (*Soule, supra,* 8 Cal.4th at p. 567, italics added.) First, to the extent
Howard has chosen the consumer expectations test, it is arguably an appropri-
ate one to evaluate his claims, since "the product, in the context of the facts
and circumstances of its failure, is one about which the ordinary consumers
can form minimum safety expectations." (*McCabe v. American Honda Motor
Co.* (2002) 100 Cal.App.4th 1111, 1124 [123 Cal.Rptr.2d 303], italics omit-
ted.) Even assuming that the slipperiness of a bathtub is something that an

ordinary consumer can evaluate, this motion and opposition alternatively addressed design defect issues, with expert opinion. Accordingly, since the record addresses both prongs of *Barker, supra,* 20 Cal.3d 413, and this is de novo review, we should consider Howard's claim that his pleading and proof raise triable issues about the defectiveness of the product, despite its compliance with industry standards.

Under the risk-benefit prong of *Barker, supra,* 20 Cal.3d 413, a fact finder may receive expert advice on "reasonable" safety expectations for the product, to assist it to "apply clear guidelines, and decide accordingly whether the product's design is an acceptable compromise of competing considerations." (*Soule, supra,* 8 Cal.4th 548, 567, fn. 4.) Here, the dueling experts opined on the safety and adequacy of both the product and the industry standards. Dr. Solomon drew a distinction between the industry standards used (e.g., ASTM F 462-79), and the principles of forensic safety that he was interpreting with his expert opinions, i.e., that more stringent standards were needed.

The manufacturing methods for bathtubs and the application of nonslip coatings are matters "plainly beyond the common experience of both judges and jurors." (*Stephen, supra,* 134 Cal.App.4th 1363, 1373.) Whenever the issue of design defect goes beyond the common experience of the product's users, the rule is that the risks and benefits of a challenged design must be carefully balanced, and expert testimony is proper to assist the finder of fact in deciding if a product is defective. (*Soule, supra,* 8 Cal.4th 548, 566.)

On review of these rulings, the effect of expert testimony is evaluated under these standards: "To the extent the trial court excluded the testimony on the ground that there was no reasonable basis for [the expert's] opinion, we review the ruling for abused discretion; to the extent the trial court's ruling is based on conclusions of law, we review those conclusions de novo. [Citations.]" (*Stephen, supra,* 134 Cal.App.4th 1363, 1370, fn. 5; see *Lockheed Litigation Cases* (2004) 115 Cal.App.4th 558, 563–564 [10 Cal.Rptr.3d 34].) An expert's opinions and conclusions must have reasonable bases and reflect more than speculation or conjecture. (*Stephen, supra,* at p. 1371.) It is not proper for an expert to base opinions on assumptions that are not supported by the record, or on information that would not be reasonably relied upon by other experts. (*Ibid.*)

Once Howard's expert admitted that the industry standards were met, his further views that higher safety standards were needed, under these circumstances, were not supported by anything other than his own opinion. Although industry standards alone would not be dispositive, other evidence

was presented about Kohler's testing processes, quality control through factory audits, and consumer preferences.[5] Kohler monitors complaints about its products and investigates them. Prior similar accidents in Kohler bathtubs were not shown by Howard to be so similar as to place the manufacturer on notice that its products were unreasonably dangerous.

Howard did not show through admissible evidence that Kohler had or should have had knowledge of any greater dangers that should have been addressed in its design of the nonslip surface, such as the friction coefficient or the amount of surface coverage required, which were not addressed through its successful compliance with industry standards. (*Hasson, supra*, 32 Cal.3d 388, 407.) To overcome this summary judgment motion, Howard and his expert were obligated to give a greater factual basis for application of any higher safety standards to be met for this product design, in view of the evidence of its compliance with industry standards, together with the methods that Kohler showed it used for quality control in producing its product. No such triable issues were identified by Howard.

### C. Application: Negligence Standards

We have already discussed the scope of the issues properly pled against Kohler, in the summary judgment context, and we determined that both ordinary negligence standards and industry standards were within the scope of the "applicable standards" pled. Howard's effort to prove his allegations depended on his expert's opinions that the bathtub should meet not only industry standards, but also more generalized safety standards, such as could be developed in tort law through "principles of forensic safety."

For his negligence claim, Howard had to show breach of duty, causation, and damages. (*Artiglio v. Corning Inc.* (1998) 18 Cal.4th 604, 614 [76 Cal.Rptr.2d 479, 957 P.2d 1313]; *Stephen, supra*, 134 Cal.App.4th 1363, 1370–1371.) CACI No. 1221 sets forth this basic standard of care for a negligence claim: "A [designer/manufacturer/etc.] is negligent if [it] fails to use the amount of care in [designing/manufacturing/etc.] the product that a reasonably careful [designer/manufacturer/etc.] would use in similar circumstances to avoid exposing others to a foreseeable risk of harm. [¶] In determining whether [defendant] used reasonable care, you should balance what [defendant] knew or should have known about the likelihood and severity of potential harm from the product against the burden of taking safety measures to reduce or avoid the harm."

In addition to arguing his expert was correct in enunciating a higher standard of care, Howard contends that the trial court improperly used the

---

[5] At argument, Kohler's attorney pointed out that people who are bathing do not want to stand or sit on concrete, which has a higher friction coefficient.

analysis in *Spann, supra*, 34 Cal.App.4th 644, when evaluating his expert testimony about the applicable standards a manufacturer should meet. Howard argues that the reasoning in *Spann* is confined to professional negligence cases, while this is a very different type of claim.

Both *Spann, supra*, 34 Cal.App.4th 644 and *Osborn v. Irwin Memorial Blood Bank* (1992) 5 Cal.App.4th 234 [7 Cal.Rptr.2d 101] (*Osborn*), dealt with problems of whether a blood bank had taken appropriate steps to prevent the contamination of blood, and they treated the problem as "a question of professional negligence which had to be decided by looking at the custom and practice of the industry." (*Spann, supra*, at p. 652, italics omitted; see *Osborn, supra*, at pp. 276–282.) Blood banks were not found negligent for failing to perform tests that no other such institutions in the nation were using. (*Osborn*, at p. 282.) These appellate court decisions were based on determinations that competent expert evidence had been presented, showing the defending blood banks had met the industry standard of care. In response, those plaintiffs seeking to prove negligence liability had only produced an expert's personal opinion of what the industry should have done, but they failed to address the applicable customs and practices of the blood banking industry at the relevant time periods.

In *Spann* the court stated: "We agree with the *Osborn* court that a single expert should not be permitted to 'second-guess an entire profession' when it comes to establishing a professional standard of care. [Citation.] . . . Because a professional standard of care is established by the accepted industry practice, *not the opinion of a single expert*, Mr. Spann failed to create a triable issue of fact on this issue. Consequently, the trial court properly granted summary judgment on the cause of action for professional negligence." (*Spann, supra*, 34 Cal.App.4th 644, 655, italics added.)

Howard argues that this authority is distinguishable and must be confined to the professional negligence arena. However, although the particular standard of care of a manufacturer is different from the standard of care of a professional, or a health care institution, similar expert testimony rules are utilized to address either standard. " 'It is for the trial court to determine, in the exercise of a sound discretion, the competency and qualification of an expert witness to give his opinion in evidence [citation], and its ruling will not be disturbed on appeal unless a manifest abuse of that discretion is shown.' " (*Osborn, supra*, 5 Cal.App.4th 234, 273–274, quoting *Huffman v. Lindquist* (1951) 37 Cal.2d 465, 476 [234 P.2d 34].)

In the case before us, qualified engineers examined the subject bathtub and rendered detailed opinions about the adequacy of it as a product, by applying

and giving opinions about the adequacy of industry standards for manufacturing such products. The type of materials and techniques used for manufacturing products are not matters of "common knowledge," and Howard needed opinions from qualified experts to establish there were triable issues of fact regarding breach of duty and negligence, as well as design defect. The same principles for establishing the proper scope and objectives of expert testimony, as utilized in *Spann, supra,* 34 Cal.App.4th 644, and *Osborn, supra,* 5 Cal.App.4th 234, can properly be extended to evaluate the persuasiveness of expert testimony on the safety of a product, in light of industry standards. A fair reading of *Spann* and *Osborn* shows that they developed evidence law in a particular professional negligence context, but that those general analytical principles may be extended to other types of negligence, such as alleged here.

Moreover, such expert testimony about the safety of a product, in light of industry standards, can also take into account other applicable and relevant circumstances. (See *Stephen, supra,* 134 Cal.App.4th at pp. 1370–1372.) As framed by CACI No. 1221, the negligence inquiry asks if the manufacturer failed to use the amount of care in designing the product that a reasonably careful designer or manufacturer would have used in similar circumstances. Kohler's qualified engineer described the methods that are used at the factory to ensure that certain standards are met in the production of the antislip coating, such as auditing and testing the friction coefficient of a certain number of bathtubs per week, and by having a protocol to replace the grit that is used for sandblasting on a routine basis, to assure that the machinery does everything that it is supposed to do. Kohler receives complaints about its products and investigates them.

In response, Dr. Solomon presented only conclusionary statements of opinion, and could not cite to any evidence in the industry or to the individual circumstances presented here, to show why the procedures used by Kohler to address the problem of slipperiness, or the industry standards that it followed, were somehow inadequate. The trial court was justified in granting summary judgment to Kohler. These conclusions on duty and breach make it unnecessary to discuss any causation issues at this stage of the proceedings.

## III

### CLAIMS AGAINST OMNI

On appeal of the new trial order, Omni argues that the trial court got it right the first time when it granted Omni's summary judgment, because Howard had failed to bring forward evidence showing Omni was in possession of facts giving it actual or constructive knowledge that this bathtub was dangerously slippery. At the time of the summary judgment ruling, the trial

court determined that not enough was known about the factual circumstances of other accidents at another Omni hotel, or the condition of those bathtubs, to deem them to be substantially similar in nature and to give rise to such notice that required corrective action.

However, the court then granted a new trial, reasoning that on the facts before it, it should instead have concluded that triable issues of fact remained regarding the existence of actual or constructive notice of an unreasonably dangerous condition, based on knowledge available to Omni about two previous bathtub accidents in the New Haven hotel. We next outline principles of premises liability for evaluating the record on this issue of actual or constructive notice of any unreasonable levels of risk posed by the bathtubs.

### A. Applicable Standards: Premises Liability/Negligence

Commercial property owners are not insurers of the safety of their patrons, although they owe the patrons duties "to exercise reasonable care in keeping the premises reasonably safe." (*Ortega v. Kmart Corp.* (2001) 26 Cal.4th 1200, 1205 [114 Cal.Rptr.2d 470, 36 P.3d 11] (*Ortega*); see *Moore v. Wal-Mart Stores, Inc.* (2003) 111 Cal.App.4th 472, 477 [3 Cal.Rptr.3d 813] (*Moore*).) To exercise a degree of care that is commensurate with the risks involved, the owner must make reasonable inspections of the portions of the premises open to customers. (*Ortega, supra*, at p. 1205; *Moore, supra*, at p. 476.) An owner is liable for harm caused by a dangerous condition, of which the owner had actual or constructive knowledge. (*Ortega, supra*, at p. 1206.) An injured plaintiff has the burden of showing that the owner had notice of the defect in sufficient time to correct it, but failed to take reasonable steps to do so. (*Moore, supra*, at p. 476.) One way to carry that burden is to raise an inference that the hazardous condition existed long enough for the owner to have discovered it, if an owner exercising reasonable care would have learned of it. (*Ortega, supra*, at pp. 1210–1213; *Moore, supra*, at p. 477.)[6]

Hotel proprietors have a special relationship with their guests that gives rise to a duty " 'to protect them against unreasonable risk of physical harm.' " (*Peterson, supra*, 10 Cal.4th 1185, 1206.) " 'The duty in each case [(as with common carriers)] is only one to exercise reasonable care under the circumstances. The defendant is not liable where he neither knows nor should

---

[6] Omni cites several out-of-state cases to contend that no evidence of any previous bathtub accidents should have been admissible, because there had never been an accident in this same hotel room. (*Johnson v. Red Roof Inns* (E.D.Mich., June 24, 1997, No. 96-CV-72955-DT) 1997 U.S.Dist. Lexis 12069; *Coyle v. Beryl's Motor Hotel* (Ct.App. 1961) 85 Ohio Law Abs. 492 [171 N.E.2d 355].) Such cases are not persuasive under the more modern premises liability rules set forth in *Ortega, supra*, 26 Cal.4th 1200.

know of the unreasonable risk . . . .' " (*Ibid.*) However, hotel guests can reasonably expect that the hotel owner will be reasonably diligent in inspecting its rooms for defects, and correcting them upon discovery. "But the guest cannot reasonably expect that the owner will correct defects of which the owner is unaware and that cannot be discerned by a reasonable inspection." (*Peterson, supra,* 10 Cal.4th 1185, 1206.)

■ The fact that an accident occurred does not give rise to a presumption that it was caused by negligence. (*Buehler, supra,* 224 Cal.App.3d 729, 734.) Instead, the injured plaintiff must establish sufficient facts or circumstances that support an inference of a breach of duty, to defeat a summary judgment motion by a defendant that is asserting due care was exercised. It is not enough for the plaintiff to provide speculation or conjecture that a dangerous condition of property might have been present at the time of the accident. (*Ibid.*)

■ Although no two accidents happen in the same way, to be admissible for showing notice to a landowner of a dangerous condition, evidence of another similar accident must have occurred under substantially the same circumstances. (See 1 Witkin, Cal. Evidence (4th ed. 2000) Circumstantial Evidence, § 104, p. 452; *Stephen, supra,* 134 Cal.App.4th at p. 1371; *Simmons v. Southern Pac. Transportation Co.* (1976) 62 Cal.App.3d 341, 363–364 [133 Cal.Rptr. 42]; *Goebel v. City of Santa Barbara* (2001) 92 Cal.App.4th 549, 557 [111 Cal.Rptr.2d 901].) This evaluation of similarity is a discretionary determination by the trial court, subject to correction for abuse of discretion, if the record does not support it. (*Stephen, supra,* at p. 1371.) To the extent the trial court's ruling on that issue was based on conclusions of law, we review those conclusions de novo. (*Id.* at p. 1370, fn. 5.)

We also note that at this point in the litigation, Howard does not appear to be claiming that Omni's maintenance of the bathtub in his hotel room was faulty (such as if it had allowed excessively slippery foreign substances to accumulate there). Instead, he is now arguing that the evidence of other falls in other Omni hotels was enough to create a duty in Omni to take further protective measures.

### B. Extent of Notice; Analysis

■ Omni relies on various out-of-state cases to contend that a property owner may properly rely on industry standards to defeat a claim that its bathroom fixtures are defective or dangerous. (See *Haney v. Marriott Internat., Inc.* (D.D.C., Oct. 9, 2007, Civ. A. No. 05-2501(JDB)) 2007 U.S.Dist. Lexis 74872; *Billings v. Starwood Realty* (N.D.Ga., Sept. 13, 2006, Civ. A. No. 1:04-CV-3522-JEC) 2006 U.S.Dist. Lexis 65182.) Although evidence that

the condition of the property is in compliance with "industry" standards is relevant, that is not the only inquiry necessary for applying California premises liability standards, as outlined above. The overall question is whether Omni, as an owner, used reasonable care under all the relevant known circumstances, to discover and correct any identifiable dangerous condition of its property. (CACI No. 1011.)

This record shows that Omni's circumstances included knowledge of its director of security, Lars Renteria, that the San Diego hotel had been in operation for 22 months, the tub had been in use and had been cleaned throughout that period, and there had not been any other reports there of bathtub injuries. Omni did not routinely provide bathmats to guests, but Omni staff would have obtained them if they were requested (although they were not). Omni's independent engineering expert tested the coefficient of friction on the bathtub and found that it complied with industry standards (ASTM F 462-79).

Omni's nationwide corporate director of engineering, Dingler, testified in his deposition that when he learned about the San Diego incident, he did an inquiry throughout the company about any problems with similar bathtubs, and learned about the New Haven incidents. Out of the 38 Omni owned/managed hotels, there were six hotels that had Kohler tubs, and one of them had had a slipping incident or two. Howard argues such an inquiry should have been done earlier, because those reports of two different people slipping in bathtubs at the New Haven Omni hotel were generated in 2004 and 2005, and those injured persons told Omni personnel their tubs were not safe without a rubber bathmat.

Relying on those reports of two bathtub accidents at the New Haven Omni hotel, Howard argued that even though the Kohler bathtub met industry standards for coefficient of friction and surface coverage of the antislip coating, the tub was nevertheless unsafe, and/or further protections should have been provided. He also relied on the discovery materials that showed Kohler had institutional knowledge of four other such hotel tub accidents.

Omni objected to such use of the New Haven slip incidents. In connection with the Kohler summary judgment motion, the trial court had considered the New Haven incident reports, as exhibits attached to a deposition, for the purpose of showing that there was some degree of notice to "defendant" of earlier accidents, and it apparently used the same analysis about Omni.

Omni now argues those prior incidents were not shown to be substantially similar and they therefore amounted to an inadequate showing, as a matter of law, to support any grant of a new trial based on the theory that it should

have exercised more reasonable care to discover and correct the condition of the bathtub. (*Peterson, supra*, 10 Cal.4th 1185, 1206.) Such corrective action might have included providing bathmats, grab bars, or an aftermarket antislip treatment. The burden was on Howard to show that Omni had notice of undue danger or defective slipperiness of the bathtub, within sufficient time to correct it. (*Moore, supra*, 111 Cal.App.4th 472, 476.)

We disagree with the trial court that Howard's evidence raises a triable issue of fact on Omni's actual notice of a dangerous condition of its property. We do not need to rely on any legal conclusions about the Kohler product safety criteria to reach that conclusion, although we do not ignore the commonsense factors that bathtubs can be slippery, or that Omni purchased a widely used brand name tub in furnishing its hotel. First, the incident reports do not show substantially similar accidents, regarding any detail about the conditions of or in the bathtubs, or the circumstances or medical conditions of the guests before they fell in the bathtubs. The reports do not provide such evidence of sufficient facts or circumstances to support an inference of Omni's breach of duty, but support only speculation or conjecture that Omni should have recognized earlier that Kohler tubs presented a dangerous condition of its property, if they did. (*Buehler, supra*, 224 Cal.App.3d 729, 734.)

It is not enough for Howard now to argue that Omni breached a duty to him, as a future guest, when it failed to communicate what it knew among its various hotels, such as the New Haven injured guests' beliefs that their accidents were caused by a lack of bathmats. At argument on the motions, counsel for Omni pointed out that another factor in deciding on whether to supply bathmats is whether they collect mold and create a new problem. That may be an issue of hotel management, which was outside the scope of the expertise of these engineers, or the scope of these pleadings. On this bare record, we cannot base our decision on some alleged inadequacy of Omni's safety policies and/or communication among its hotels.

We further disagree with Howard's contention that when the New Haven slipping incidents occurred, Omni was placed upon a heightened duty of inquiry to find out from Kohler if there had been any further such incidents. Other than saying he could bring in "ample evidence" to allow a jury reasonably to find that Omni had both actual and constructive knowledge that the tubs in its hotel rooms, including those in the San Diego Omni, were dangerously slippery, Howard provides only his own witness testimony and interpretations. He has not shown triable issues of fact exist on whether Omni breached its relevant duties to him, based on what it knew about all the circumstances, including the supply of bathtubs for use by guests.

## DISPOSITION

Summary judgment is affirmed as to Kohler; order reversed as to Omni with directions to enter a defense summary judgment. Costs on appeal to be borne by Howard.

Benke, Acting P. J., and Irion, J., concurred.